# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 19, 2011

No. 07-41041

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

MARIA AIDE DELGADO

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before WIENER, DENNIS, and CLEMENT, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

Defendant-Appellant Maria Aide Delgado was convicted of (1) possession of marijuana with the intent to distribute and (2) conspiracy to commit the same offense, 21 U.S.C. § 841(a)(1) & (b)(1)(B); 18 U.S.C. § 371.0. She was sentenced to a concurrent term of 100 months imprisonment for each conviction. Delgado appealed. For the reasons assigned herein, we vacate her convictions and sentences, dismiss the conspiracy charge of the indictment because the government failed to introduce sufficient evidence to convict her of conspiracy, and remand the case to the district court for further proceedings on the possession with intent to distribute charge.

No. 07-41041

The evidence presented by the prosecution was not sufficient to support a finding by a jury beyond a reasonable doubt that Delgado was guilty of conspiracy. Delgado's unconsummated "agreement" with a produce broker's agent to commingle marijuana with produce in a motor freight shipment was not an actual agreement as required for the crime of conspiracy: the broker's agent was an undercover government informer, who only pretended to agree to the scheme with Delgado pursuant to ICE officers' plan to incriminate Delgado and seize contraband marijuana. The evidence was also not sufficient to support a finding by a jury beyond a reasonable doubt that Delgado agreed with the unknown person who supplied the marijuana, the unknown prospective recipient, or any other person, to commit a crime that amounted to more than a buyer-seller relationship. The district court did not inform the jury that neither an agreement with a government informer who intends to frustrate the conspiracy, nor a simple buyer-seller relationship, is legally sufficient to amount to a conspiracy. Because there was no evidence that Delgado entered into an agreement with anyone other than the informer to engage in anything beyond a simple buyer-seller transaction, the conspiracy charge must be dismissed due to insufficient evidence.

In addition, Delgado's trial was rendered fundamentally unfair by the cumulative effects of several errors. Two members of the prosecution team engaged in trial misconduct that was unfairly prejudicial to Delgado. The prosecutor, in his closing argument, told the jury that Delgado (who did not take the witness stand) had lied when she told the investigating government agents that she was unaware that marijuana had been hidden in the sleeping compartment of the truck. In addition, a law enforcement officer witness made an uncalled-for comment during his testimony to the effect that Delgado's

2

No. 07-41041

trucking company had been involved in a prior, uncharged, drug-related crime. Furthermore, the district court improperly instructed the jury that it could find Delgado guilty of possession if it found that she had been deliberately ignorant as to whether the marijuana was located inside a truck on her premises; that instruction was erroneous because the government failed to lay the required predicate for it by introducing evidence of circumstances indicating that Delgado was subjectively aware of a high probability that the marijuana was in the truck and consciously avoided discovering it. And the record on appeal does not contain a complete transcript of the proceedings at trial, thereby limiting the ability of Delgado's new appellate counsel to present an effective appeal. These errors, in the context of this case, were cumulatively sufficient to render the proceedings fundamentally unfair. Delgado is therefore entitled to a new trial as to the remaining charge against her.

## I.  FACTS

The government's case against Delgado was based essentially on the testimony of a paid informer as to Delgado's agreement, which was never consummated, to pay the informer to help her ship marijuana concealed in a legitimate load of broccoli; and the testimony of law enforcement officers concerning their discovery of a large quantity of marijuana in a locked tractor-trailer parked at her house. Delgado did not testify at trial. The government failed to present any witness who could testify to having seen her possess marijuana or enter the truck. Nor did any prosecution witness, other than the paid informer, testify to having heard Delgado confess or admit to knowingly possessing the marijuana.

3

No. 07-41041

On September 11, 2006, federal customs officers, acting on the informer's tip and Delgado's consent to search her rural residence near Weslaco, Texas, found 230 kilograms of marijuana secreted in the locked sleeper cab of a semi-trailer truck parked inside her fence. Delgado denied knowing that the drugs were inside the vehicle and told the officers that the truck driver who had parked and locked the rig there must have left the marijuana inside. Delgado was, insofar as the evidence disclosed, the sole owner-operator of TJ Trucking, which hired drivers to operate its semi-trailer that transported Mexican produce between Laredo, Texas and points throughout the United States. She did not drive or accompany the truck on long hauls, but operated the business largely by phone from an office in her home.

The informer, Bartolome Vasquez, was a Mexican legal resident employed by a Laredo, Texas produce broker and shipper. Vasquez testified that he had known and done business with Delgado for almost four years, during which time he assembled shipments of Mexican produce to be hauled by TJ Trucking. He dealt regularly with Delgado by phone and in person and estimated that they spoke approximately four times per month to arrange shipments. He regarded her as a legitimate trucking business operator until, on September 8, 2006, she abruptly offered to pay him $10,000 if he would commingle bundles of marijuana in a TJ Trucking delivery of Mexican broccoli to North Carolina. Vasquez said that he refused her offer and immediately reported the incident to Immigration and Customs Enforcement (ICE) officers in Laredo. He knew they might reward such information, because he had informed on customs violators on two prior occasions for $300 and $1,000 respectively. He testified that he received a $7,500 tax-free reward prior to trial for his information and efforts to incriminate

4

No. 07-41041

Delgado.  Somehow — his testimony did not explain exactly how — he withdrew his initial refusal of Delgado's offer and agreed to begin making arrangements for the concealed drug shipment.  At the same time, he secretly worked with ICE officers to tape her phone conversations with him about the arrangements.  They were able to record only some of the conversations, which were in Spanish and appeared to be only a discussion of arrangements for a regular produce shipment.  However, Vasquez testified that the conversations were in code and were really about the proposed marijuana-laced produce shipment.  He related that he and the ICE officers planned to have Delgado send the truck containing the marijuana to rendezvous with him on September 11, 2006 at a government-controlled warehouse in Laredo. He said the officers planned to make arrests and seize the drugs  then and there. However, he testified, on September 11, 2006, she called and told him the shipment was cancelled because the North Carolina recipient had been arrested.  Vasquez testified that he immediately informed the ICE officers of what had happened; told them that the rig with the marijuana was parked at her house; and told them that she had said she would try to return the marijuana that night.

There are some discrepancies or oddities in the record that tend to detract from the reliability of Vasquez's testimony.  Although he was over 50 years old, had lived in the United States most of his life, and had taken three years of college-level English, he required the assistance of an interpreter in his testimony.  Although the government's opening statement described Delgado's alleged promise to pay Vasquez $10,000 as being conditioned upon the marijuana-laced produce shipment clearing inspection and "get[ting] it past law enforcement," Vasquez's testimony relates no such conditions.  Further, Vasquez testified that

5

No. 07-41041

Delgado said she planned to try to return the marijuana, but did not say how, where, or to whom; nor did he otherwise indicate that she would be successful in that attempt.

On September 11, 2006 , a dozen or so ICE officers from Laredo and McAllen converged on Delgado's house near Weslaco at about 2 p.m.  They could see the truck described by Vasquez parked inside the locked fence.  Delgado initially did not respond to the officers for about 30 minutes; she then opened her door and, after being informed that the officers were checking out a marijuana tip, agreed to allow them into her property for a search.  She voluntarily opened her closet and safe, where the officers found three handguns and a shotgun.  They also seized her cell phone, computer, and business papers and records.  But she claimed she did not have a key to the truck; she said that only the driver had the key and she did not have his phone number.  An officer with a drug-sniffing dog arrived, and Delgado allowed the dog to traverse her property inside and out and around the semi-trailer rig.  The dog did not alert on anything.  Some of the officers terminated their search as fruitless at this point, but others persisted. After unsuccessfully trying to open the rig's cab with keys from Delgado's office, an officer obtained her permission to do anything he could, without breaking anything, to get in.  He ultimately was able to unlock the cab door with a coat hanger and discovered 230 kilograms of marijuana hidden in the sleeper compartment.  Another officer searched a large room inside the house where several large dogs were tied up; he was bitten once by one of the dogs.  The officer found a number of aluminum wrappers inside a trash bag with what the officers believed was marijuana residue.  Delgado told the officers that she thought it was potting soil that her house and garden worker, Peter (or Pedro), had brought in.

6

No. 07-41041

A chemist's test, introduced by stipulation, determined that the bundles found in the truck were marijuana. But no such test was introduced to scientifically identify the residue found in the wrappers in the house or link it to the bundles of marijuana found in the truck. Only a photo of the wrappers was introduced at trial. Although the officers immediately seized the marijuana bundles, the wrappers with residue, Delgado's computer and cell phone, and her business and banking records and papers, they did not immediately seize the truck. Delgado was not arrested until October 19, 2006, nearly a month after the search and seizures. Although officers testified that they had located Peter — the house and garden worker — and one officer reported seeing Delgado's ex-husband at her house on a later date, neither of these possible witnesses testified at trial. Evidently, the officers were unable to develop any evidence of illegal drug activity by Delgado from her cell phone, computer, and business, financial and banking records, because none was introduced at trial. The questions of whether other persons were involved with Delgado in the TJ Trucking business, whether other members of her family resided in her house, and the identity of the registered owner of the truck, were not explored or answered at trial. Further, the officers did not attempt to develop fingerprint evidence from the wrappers with residue, the bundles of marijuana, or the sleeper cab of the truck, to link them to Delgado or anyone else. The government introduced no evidence identifying the supplier of the marijuana or the prospective recipient in North Carolina. The evidence provided no indication of the nature or extent of Delgado's relationship, if any, with the supplier or the prospective recipient of the marijuana.[1]

---

[1] The dissent infers that Delgado "worked with a supplier who dealt in substantial quantities of the drug." Dissent at 5. However, as noted, the government offered no evidence regarding where the marijuana came from.

No. 07-41041

Albert Aguilar, who lived in Weslaco near Delgado's house, worked as TJ Trucking's driver for some ten months before the ICE officers seized the rig when he drove it to Laredo on September 13, 2006. He testified that he was the only driver operating the truck during that period. He denied having any knowledge of contraband or drug activity involving the truck. He testified that he drove loads of produce for Delgado and TJ Trucking almost weekly from Laredo to points throughout the United States. He said that he was paid about $1,200 to $1,400 per week or trip, and that between trips he always parked the truck at Delgado's house, locked the cab, and left the key with Delgado. He said he knew of only one key to the truck.

Regarding the week before the officers' discovery of marijuana in the truck on September 11, 2006, Aguilar testified he picked up a load of pork in Omaha, Nebraska and headed back to Texas. On September 7, 2006, he arrived in Weslaco, parked the truck at Delgado's house, locked the cab and left the key with Delgado, and went home. On September 8, 2006, he said, he picked up the truck at her house and drove the load of pork to Hidalgo, Texas, where the pork was unloaded. Then he recounted that he went to Edinburg, Texas to drop off the bill of lading at the broker's office. From there he took the truck to a shop for mechanical work in Donna, Texas, where he left it and the keys. He testified that at that time there was no marijuana in the vehicle. On September 13, 2006, Delgado called him at his home, told him about the officers' search of the truck on September 11, 2006 — but assured him the truck was now "clean" — and asked him to pick up a new load in Laredo. Delgado met him with the truck at a tire shop where they put air into the tires. After that, on September 13, 2006,  he drove the truck to Laredo, where it was seized by the ICE officers. Because the

8

No. 07-41041

truck was left at the mechanic's shop in Donna, Texas on September 8, 2006, and there was no evidence tracing its movements or its contents between that date and September 11, 2006, the mechanic shop personnel and perhaps others had access to the rig and could have cached the marijuana inside during the three days before the agents' search of it on September 11. The government did not introduce any evidence as to the number or identity of the other persons who had access to the truck during that interval. As to Aguilar himself, the government did not introduce any evidence to corroborate his testimony, such as witnesses to verify his whereabouts and activities prior to the drug search and seizure or to confirm that his cell phone, banking, and financial records showed no signs of involvement in illicit drug activity.

In sum, although the Government said that it would prove that Delgado was a member of a large-scale illegal drug operation, it failed to identify or to prove conspiracy or cooperation between her and any bona fide co-conspirators, which, as a practical matter, would have been necessary to such an operation.

## II.  CONSPIRACY

We consider *sua sponte* whether there was sufficient evidence to support Delgado's conspiracy conviction. This court "will consider a point of error not raised on appeal when it is necessary 'to prevent a miscarriage of justice.'" *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009) (quoting *United States v. Montemayor*, 703 F.2d 109, 114 n.7 (5th Cir. 1983)). As the Supreme Court has explained, "'In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously

9

affect the fairness, integrity, or public reputation of judicial proceedings.'" *Silber v. United States*, 370 U.S. 717, 718 (1962) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).  These principles apply even when the defendant has also failed to raise the point of error before the district court.  *See Whitfield*, 590 F.3d at 347 (citing *United States v. Musquiz*, 445 F.2d 963, 966 (5th Cir. 1971)).  In this case, Delgado's wrongful conviction of conspiracy to possess marijuana with intent to distribute, unsupported by evidence sufficient to convict, obviously affects the fairness, integrity, and public reputation of the proceedings.  Accordingly, our consideration of the issue is necessary to prevent a miscarriage of justice in this case.

"Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777 (1975).  The agreement necessary to convict a defendant of conspiracy "need not be shown to have been explicit.  It can instead be inferred from the facts and circumstances of the case." *Id*. at 777 n.10.  "In some cases reliance on such evidence perhaps has tended to obscure the basic fact that the agreement is the essential evil at which the crime of conspiracy is directed." *Id*. (citing *Developments in the Law — Criminal Conspiracy*, 72 Harv. L. Rev. 920, 933-34 (1959)).  "Nonetheless, agreement remains the essential element of the crime, and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact, and from other substantive offenses as well." *Id*. (citation omitted).  *See also United States v. Shabani*, 513 U.S. 10, 16 (1994) ("The prohibition against criminal conspiracy . . . does not punish mere thought; the criminal agreement itself is the *actus reus* . . . .").

No. 07-41041

It is axiomatic that a conspiracy conviction may not rest on an "agreement" with a government informer. "[A]s it takes two to conspire, there can be no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy." *Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965). *See also United States v. Corson*, 579 F.3d 804, 811 (7th Cir. 2009) ("[A]n agreement must exist among *coconspirators*, that is, those who actually intend to carry out the agreed-upon criminal plan. A defendant is not liable for conspiring solely with an undercover government agent or a government informant." (citation omitted)); *United States v. Paret-Ruiz*, 567 F.3d 1, 6 (1st Cir. 2009) ("The agreement must exist between two or more persons, and as a matter of law, there can be no conspiracy between a defendant and a government agent."); *United States v. Carlton*, 442 F.3d 802, 811 (2d Cir. 2006) ("The agreement to conspire requires that at least two culpable co-conspirators agree, and a 'person who enters into such an agreement while acting as an agent of the government, either directly or as a confidential informant, lacks the criminal intent necessary to render him a *bona fide* co-conspirator.'" (quoting *United States v. Vasquez*, 113 F.3d 383, 387 (2d Cir. 1997))). Thus, evidence of any agreement Delgado had with the governmental informant Vasquez cannot support her conspiracy conviction.

Furthermore, this circuit and others have held that "a buyer-seller relationship, without more, will not prove a conspiracy." *United States v. Maseratti,* 1 F.3d 330, 336 (5th Cir. 1993) (citing *United States v. Hughes*, 817 F.2d 268, 273 (5th Cir. 1987)); *United States v. Thomas*, 12 F.3d 1350, 1365 (5th Cir. 1994) (same).[2] This rule is based on a consensus of opinion among the courts

[2] *See also United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009); *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009); *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999); *United States v. Manzella*, 791 F.2d 1263, 1265 (7th Cir. 1986); *United States v. Kapp*,

11

No. 07-41041

as to the underlying reasoning and principles of conspiracy law in the common law and the federal statutes.

Thus, the federal courts of appeals, in various articulations having essentially the same meaning, have held that, to sustain a conspiracy conviction, "[w]hat is necessary and sufficient is proof of an agreement to commit a crime other than the crime that consists of the sale itself." *United States v. Colon*, 549 F.3d 565, 569 (7th Cir. 2008).[3] "While . . . the unlawful transfer from seller to buyer cannot serve as the basis for a charge that the seller and buyer conspired with one another to make the illegal transfer from seller to buyer, the rule does not protect either the seller or buyer from a charge they conspired together to transfer drugs if the evidence supports a finding that they shared a conspiratorial purpose to advance other transfers . . . ." *United States v. Parker*, 554 F.3d 230, 235 (2d Cir. 2009).[4] "What distinguishes a conspiracy from its substantive predicate offense is not just the presence of any agreement, but an agreement with the same joint criminal objective — here the joint objective of distributing drugs.

---

781 F.2d 1008, 1010 (3d Cir. 1986); *United States v. Keck*, 773 F.2d 759, 768 (7th Cir. 1985); *United States v. Hyman*, 741 F.2d 906, 914 (7th Cir. 1984); *United States v. Dickey*, 736 F.2d 571, 583 (10th Cir. 1984); *United States v. Solomon*, 686 F.2d 863, 876 (11th Cir. 1982); *United States v. Creamer*, 555 F.2d 612, 615 (7th Cir. 1977).

[3] *See also United States v. Johnson*, 592 F.3d 749, 752 (7th Cir. 2010) (same); *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993) (en banc plurality opinion) (same).

[4] *See also United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964) ("A seller of narcotics in bulk surely knows that the purchasers will undertake to resell the goods over an uncertain period of time, and the circumstances may also warrant the inference that a supplier or a purchaser indicated a willingness to repeat. But a sale or a purchase scarcely constitutes a sufficient basis for inferring agreement to cooperate with the opposite parties for whatever period they continue to deal in this type of contraband, unless some such understanding is evidenced by other conduct which accompanies or supplements the transaction.").

No. 07-41041

This joint objective is missing where the conspiracy is based simply on an agreement between a buyer and a seller for the sale of drugs. Although the parties to the sales agreement may both agree to commit a crime, they do not have the joint criminal objective of distributing drugs." *United States v. Dekle*, 165 F.3d 826, 829 (11th Cir. 1999). "Evidence that a buyer intends to resell the product instead of personally consuming it does not necessarily establish that the buyer has joined the seller's distribution conspiracy. This is so even if the seller is aware of the buyer's intent to resell. It is axiomatic that more is required than mere knowledge of the purpose of a conspiracy." *United States v. Boidi*, 568 F.3d 24, 30 (1st Cir. 2009) (quoting *United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008)) (citing *Lechuga*, 994 F.2d at 349; *United States v. Glenn*, 828 F.2d 855, 857-58 (1st Cir. 1987) (Breyer, J.)). "[I]f the evidence showed only an agreement by Willis to sell drugs to Moran, it would not necessarily show them to be co-conspirators in drug distribution. There is substantial law . . . that a single drug sale does not automatically make buyer and seller co-conspirators. This 'rule' in varying forms prevails or has been intermittently adopted in a number of circuits, including the Second, Fifth, Sixth, Seventh and Eighth." *United States v. Moran*, 984 F.2d 1299, 1302 (1st Cir. 1993) (citation omitted) (citing *United States v. DeLutis*, 772 F.2d 902, 906 (1st Cir. 1983) (collecting cases)).

The reason for the rule "goes to the root of conspiracy law: conspiracy is treated as a separate crime because of the jointness of the endeavor." *Moran*, 984 F.2d at 1302 (emphasis removed). "A multiplicity of actors united to accomplish the same crime is deemed to present a special set of dangers, either an enhanced likelihood that the criminal end will be achieved, or that the conspiracy will carry over to new crimes, or both." *Id.* at 1302-03 (citations omitted) (citing *Callanan*

No. 07-41041

*v. United States*, 364 U.S. 587, 593 (1961)); *United States v. Rabinowich*, 238 U.S. 78, 88 (1915); 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 6.4(c) (1986)).[5]  *See also* 2 Wayne R. LaFave, *Substantive Criminal Law* § 12.1(c) (2d ed. 2003 & Supp. 2009). "It is these dangers stemming from jointness that justify early intervention to stem conspiracies even before they rise to the level of attempts and to impose a separate punishment on the conspirators even if they fail to achieve their ends." *Moran*, 984 F.2d at 1303.  "This special set of dangers is present if two individuals agree that one of them will sell cocaine and the other will assist; it is arguably not present if one merely sells the same cocaine to another without prearrangement and with no idea of or interest in its intended use.  In the latter case, both may be guilty — one of distribution and the other of possession — but without more they are not conspirators." *Id.*

Cases in this and other circuits list factors from which a trier of the facts may, but is not required to, infer a defendant's agreement to and participation in a conspiracy.  "But in every case such factors have to be placed in context before an inference of participation in a conspiracy can be drawn." *Colon*, 549 F.3d at 568.[6]  For instance, courts have identified "prolonged cooperation" between the

---

[5] *See also Callanan*, 364 U.S. at 593 ("Collective criminal agreement — partnership in crime — presents a greater potential threat to the public than individual delicts.  Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality.  Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish.  Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed.  In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise.").

[6] *See also Moran*, 984 F.2d at 1303 ("Almost everything in such a case depends upon the context and the details.").

14

No. 07-41041

parties[7] and "fronting" or  "sales on credit"[8] as factors that, combined with others, may support an inference of participation in an agreement to commit a separate crime beyond a buyer-seller relationship.[9]  Distinguishable also from the simple buyer-seller relationship are cases in which a seller helped a buyer "to create a distribution system for his illegal product"[10] or a buyer had "agreed to look for other customers"[11] for the seller or "had received a commission on sales to those

---

[7] *E.g., Direct Sales Co. v. United States*, 319 U.S. 703, 713 (1943); *United States v. Hicks*, 368 F.3d 801, 805 (7th Cir. 2004); *United States v. Wyche*, 65 F. App'x 509, 2003 WL 1922966, \*3 (5th Cir. 2003) (unpublished).

[8] *United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008); *Hicks*, 368 F.3d at 805. *See also United States v. Price*, 13 F.3d 711, 728 (3d Cir. 1994); *United States v. Hughes*, 817 F.2d 268, 273 (5th Cir. 1987); *United States v. Carbone*, 798 F.2d 21, 27 (1st Cir. 1986).
   In the present case, the dissent mistakenly claims that "Delgado was fronted money in advance."  There is nothing in the record to support that assertion.  Vasquez testified that Delgado was waiting to receive some "money she was going to be paid, which, in turn, she was going to use to pay us off once the marijuana had been loaded inside the boxes."  He did not know who was supposed to pay her this money; nor did he say what the expected payment was for.  It is pure speculation to say that someone "fronted" Delgado money to pay for shipping or for any other purpose.

[9] The dissent argues that a buyer's attempt to return drugs to a seller supports the inference of an agreement going beyond a buyer-seller relationship: "Delgado's plan to return the 500-pound cache of drugs shows that she was not in a typical buy-sell relationship with her supplier."  But the ability to return merchandise is a feature of many ordinary retail transactions and does not usually indicate the existence of a broader agreement between the merchant and the customer.  Thus, the Second Circuit has held that when a buyer bought 170 ounces of cocaine and later returned 75 ounces to the seller, it could not be inferred that the buyer was in a conspiracy with the seller.  *United States v. Koch*, 113 F.2d 982, 983 (2d Cir. 1940).  The dissent cites no cases in which a buyer's attempt to return drugs to a seller was taken as proof of a conspiracy.

[10] *Colon*, 549 F.3d at 568 (citing *United States. v. Sax*, 39 F.3d 1380, 1385-86 (7th Cir. 1994)).

[11] *Colon*, 549 F.3d at 570.  *See also United States v. Posada-Rios*, 158 F.3d 832, 860 (5th Cir. 1998) ("[E]vidence that [a buyer] purchased some of the cocaine on consignment . . . is 'strong evidence' of membership in a conspiracy because it indicates a strong level of trust and an ongoing, mutually dependent relationship." (quoting *United States v. Rodriguez*, 53 F.3d

15

customers," "had advised [the seller] on the conduct of [his] business, or had agreed to warn [the seller] of threats to [his] business from competing dealers or from law-enforcement authorities."[12]

The fact that a transaction involves a large or wholesale quantity of drugs is insufficient to prove the existence of a conspiracy to possess with intent to distribute. The government must prove, not only that the seller *knew* the buyer would engage in further distribution, but that the seller *intended* and *agreed* to the shared purpose of further distribution. "There may be circumstances in which the evidence of knowledge is clear, yet the further step of finding the required intent cannot be taken. . . . [N]ot every instance of sale of restricted goods . . . in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy." *Direct Sales Co. v. United States*, 319 U.S. 703, 712 (1943). *See also* 2 LaFave, *supra*, § 12.2(c)(3) (emphasizing the importance of "the step from knowledge to intent and agreement" in *Direct Sales*). The government cannot rest its case for conspiracy only on the inference that a seller of a large quantity of narcotics must know the buyer intends to further distribute those drugs. *See United States v. Boidi*, 568 F.3d 24, 30 (1st Cir. 2009) ("But a conspiracy is an agreement between two (or more) parties having a shared 'objective' or 'design' to commit the crime, so mere knowledge by [the seller] as to

---

1439, 1445 (7th Cir. 1995)); *United States v. Pozos*, 697 F.2d 1238, 1241 (5th Cir. 1983) (noting that the fact that the defendant had introduced a customer to a seller and "received a commission on the sale" was evidence of conspiracy).

[12] *Colon*, 549 F.3d at 570. *See also United States v. Brown*, 217 F.3d 247, 255 (5th Cir. 2000) (holding that the defendants were members of a conspiracy because, inter alia, they "warn[ed] each other of police activity and referr[ed] customers to each other when unable to supply customers themselves"), *vacated on other grounds sub nom. Randle v. United States*, 531 U.S. 1136 (2001) (mem.), *as recognized in Colon*, 549 F.3d at 570.

No. 07-41041

what [the buyer] would do with the drugs is not enough unless [the seller] shared [the buyer's] purpose to re-distribute."); *United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008) ("Evidence that a buyer intends to resell the product instead of personally consuming it does not necessarily establish that the buyer has joined in the distribution conspiracy. This is so even if the seller is aware of the buyer's intent to resell. It is axiomatic that more is required than mere knowledge of the purpose of a conspiracy.").[13]   *See also Developments in the Law — Criminal Conspiracy*, 72 Harv. L. Rev. 922, 930 (1959) ("Clearly [a conspiracy's purpose] cannot be the object unless it is known to both parties; but something more than mere knowledge is necessary.").[14]

Applying the foregoing rules, principles, and factors to the present case, it is clear that there was no evidence from which a jury could rationally infer beyond

---

[13] *See also United States v. Parker,* 554 F.3d 230, 236 (2d Cir. 2009) (holding that, when wholesale quantities of drugs are involved, "the liability of buyer and seller for having conspired together to transfer drugs would depend not on the seller's mere knowledge of the buyer's intent to retransfer, but on a further showing of the seller's interest, shared with the buyer, in the success of the buyer's resale"); *United States v. Rivera*, 273 F.3d 751, 755 (7th Cir. 2001) ("Showing that the buyer purchased a quantity larger than could be used for personal consumption . . . is not enough to show conspiracy on behalf of the seller. Nor is the seller's knowledge of the buyer's illegal activities or resale objectives enough." (citations omitted)); *United States v. Price*, 13 F.3d 711, 727 (3d Cir. 1994) ("The prevalent case law does not hold that every one-time purchaser of drugs from a member of a large conspiracy, even for redistribution, necessarily becomes a member of that conspiracy.").

[14] The dissent relies heavily on the large amount of marijuana that was found in the truck. However, courts have applied the buyer-seller exception even in cases were large quantities of drugs were bought and sold. *See Rivera*, 273 F.3d at 753-56 (holding that the buyer-seller exception applied even though the defendant sold more than $79,000 worth of cocaine in four transactions over a three-month period); *United States v. Contreras*, 249 F.3d 595, 600 (7th Cir. 2001) (holding that the buyer-seller exception applied even though the defendant bought "ten one-kilogram quantities of cocaine . . . over a period of six to ten months" from the same supplier); *Koch*, 113 F.2d at 983 (holding that the buyer-seller exception applied even though "[t]he amount of the cocaine purchased [170 ounces] would, of course, indicate that it was taken not for personal consumption alone but for resale").

17

No. 07-41041

a reasonable doubt that Delgado had agreed with anyone other than Vasquez — the government undercover informer, who could not be a bona fide co-conspirator — to distribute or possess with intent to distribute marijuana or to commit an unlawful act other than the crime consisting of the buyer-seller relationship. Obviously, if Delgado possessed the marijuana bundles found in the truck, then she must have obtained them from someone, and according to the informer she planned to deliver them to an unidentified recipient in North Carolina. But, without more, the evidence is insufficient to show that she entered an agreement to commit a crime other than her acquisition and possession of the marijuana bundles with the intent to distribute them. The evidence in this case shows, at most, a single acquisition or possession of marijuana with intent to distribute, and does not include any of the factors from which the federal courts have held that a jury may infer an agreement to commit a further offense beyond the buyer-seller relationship. The jury was not informed that neither an agreement with a government informant nor a mere buyer-seller relationship is a sufficient basis to convict a defendant of conspiracy. Because there was no evidence that Delgado entered into any other agreements to commit crimes, the jury's finding that she was guilty of conspiracy can only have been based on one of these two insufficient grounds. Accordingly, we are required to reverse Delgado's conviction of conspiracy to possess marijuana with the intent to distribute and to dismiss the conspiracy charge of the indictment upon which it is based.

### III.  CUMULATIVE ERROR

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). "[T]he cumulative error doctrine . . .

18

No. 07-41041

provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998); *see also United States v. Cochran*, 697 F.2d 600, 608 (5th Cir. 1983) ("We acknowledge the principle of synergistic prejudice and are willing to examine sums and multiples when they are presented."); *United States v. Labarbera*, 581 F.2d 107, 110 (5th Cir. 1978) (holding that a conviction should be reversed where "the cumulative effect" of individually harmless errors deprived the defendant of the right to a fair trial).

> Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect. In other words, a column of error may sometimes have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts.
>
> Of necessity, claims under the cumulative error doctrine are *sui generis*. A reviewing tribunal must consider each claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy — or lack of efficacy — of any remedial efforts); and the strength of the government's case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

*United States v. Sepulveda*, 15 F.3d 1161, 1195-96 (1st Cir. 1993) (citations omitted). *See United States v. Edwards*, 303 F.3d 606, 647 (5th Cir. 2002) (citing *Sepulveda* for its explanation of the cumulative error doctrine); *United States v. Williams*, 264 F.3d 561, 572 (5th Cir. 2001) (same); *Munoz*, 150 F.3d at 418 (same). The ultimate question is whether cumulative errors "so 'fatally infect[ed] the trial' that they violated the trial's 'fundamental fairness.'" *United States v.*

No. 07-41041

*Bell*, 367 F.3d 452, 471 (5th Cir. 2004) (quoting *Derden v. McNeel*, 978 F.2d 1453, 1457 (5th Cir. 1992) (en banc)).  In making this determination, we "review the record as a whole to determine whether the errors more likely than not caused a suspect verdict." *Derden*, 978 F.2d at 1458 (citing *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985)).[15]

The government presented only a limited amount of evidence against Delgado as to the charge of possession with intent to distribute: essentially, the prosecution's evidence showed that there was marijuana concealed in the semi-trailer rig owned by Delgado's company, which was parked on her property, and that according to a single witness, a paid government informer, she planned to ship the marijuana to North Carolina.  As to the conspiracy charge, the government offered no legally sufficient evidence, as explained above.  Against this backdrop, in only a two-day trial, the prosecution and the district court committed several errors, each of which went to the central factual and legal issues of Delgado's case.  We conclude that under the circumstances of this case, these errors so infected the proceedings as to render the trial fundamentally unfair, thus depriving Delgado of her Fifth Amendment right to a fair trial.  We discuss each error and defect in turn, while keeping in mind that it was the cumulative effect of all the errors that rendered the trial fundamentally unfair.

**A.**

---

[15] The dissent repeatedly argues that none of the errors identified herein, considered in isolation, would be enough to justify reversal.  But, of course, under the cumulative error doctrine, the question we must ask is whether the effects of several non-reversible errors, put together, deprived the defendant of a fundamentally fair trial.  *Munoz*, 150 F.3d at 418; *cf. Kyles v. Whitley*, 514 U.S. 419, 440-41 (1995) (explaining that the Fifth Circuit erred by failing to make "an assessment of the cumulative effect of the evidence" and making only "a series of independent materiality evaluations" in a case involving multiple *Brady* violations).

No. 07-41041

The prosecutor at closing argument used his personal opinion and an implication of outside knowledge to improperly attack Delgado's credibility, claiming that she had in fact lied to the investigating agents. This misconduct, inflicted upon a non-testifying defendant whose credibility was not at issue, involved a central element of the offenses against Delgado: her knowledge of the marijuana found in the tractor-trailer. The district court erred by failing to give any curative instruction to correct the substantial prejudice caused by the prosecutor's impermissible argument.

Before the parties' summations, the district court orally delivered its general charge on the law to the jury. The charge included various admonitions concerning the jury's fact-finding role. Specifically, the district court instructed the jurors that they were the "sole judges of the credibility or 'believability' of each witness," and that "any statements, objections, or arguments made by the lawyers are not evidence. . . . What the lawyers say is not binding upon you." But the court did not repeat this charge or anything like it later, after counsels' closing arguments.

After the charge, and after defense counsel's closing argument, the prosecuting attorney ended his rebuttal argument by telling the jury that Vasquez was credible because he was not a "permanent snitch," but that Delgado, who had exercised her Fifth Amendment right not to testify during the trial, had lied in her statements to the investigating officers:

> Talk about motive to lie, ladies and gentlemen. Who has the motive to lie here? The driver? No. He's working all around. Mr. Vasquez. No. He's in Laredo. He's not a permanent snitch. He's not one of those individuals that makes his living off providing information. He's provided it twice in the past. The agents? You're going to blame the

21

agents for all this? Whose [*sic*] got the motive to lie here? It's the defendant, *and she's done so. She did so to these agents.*

(emphasis added). Defense counsel immediately objected, saying: "Judge, I object. My client has not testified . . . in this case." The district court sustained the objection, but offered no other instruction to the jury.

"The United States Attorney . . . is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935). As a representative of the sovereign, the prosecutor's words have notable force on the jury, and his wrongful argument attacking the defendant's credibility can severely prejudice the accused. "It is fair to say that the average jury, in a greater or less degree, has confidence that [the obligation to do justice], which so plainly rest[s] upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id.* The prosecutor's expression of personal opinion "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 19 (1985). Such an effect plainly undermines the fairness of the criminal trial and the reliability of the verdict it produces.

It is axiomatic that prosecutors cannot express to the jury their personal opinions concerning the credibility of witnesses or the defendant. *See, e.g.*, *United*

No. 07-41041

*States v. Gracia*, 522 F.3d 597, 601-02 (5th Cir. 2008); *United States v. Washington*, 44 F.3d 1271, 1278 (5th Cir. 1995); *United States v. Hernandez*, 891 F.2d 521, 526 (5th Cir. 1989); *United States v. Leslie*, 759 F.2d 366, 378 (5th Cir. 1985); *United States v. Mack*, 643 F.2d 1119, 1124 (5th Cir. 1981); *United States v. Garza*, 608 F.2d 659, 662 (5th Cir. 1979); *United States v. Herrera*, 531 F.2d 788, 790 (5th Cir. 1976); *Hall v. United States*, 419 F.2d 582, 586-87 (5th Cir. 1969). Rather, prosecutors may use their closing argument only "to assist the jury in analyzing, evaluating and applying the evidence." *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978). "By giving his opinion, an attorney may increase the apparent probative force of his evidence by virtue of his personal influence, his presumably superior knowledge of the facts and background of the case, and the influence of his official position." *Id.* Specifically, "[i]f . . . an attorney states in his summation that he believes a witness has lied, his statement suggests that he has private information supporting his beliefs." *Id.*

Thus, "even the most inexperienced prosecutor should be aware that it is improper and highly inappropriate to interject his or her personal opinion of the defendant's veracity into the decision-making process." *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1238 (5th Cir. 1990). Yet the prosecutor in this case did so. The prosecutor expressly attacked Delgado's credibility and opined that she had lied, stating that "she's done so. She did so to these agents." This impermissible expression of opinion stands in sharp contrast to his arguably permissible statements, immediately preceding this attack, as to which persons merely had motives to lie. But the prosecutor did not limit his argument to the evidence: he went one step further and told the jury that Delgado had lied, an expression of opinion regarding fact and credibility that is not properly the subject

23

of an attorney's closing argument.  By effectively calling Delgado a liar and declaring that she had lied to investigating governmental agents, the prosecutor threw the weight of his own credibility as a representative of the United States behind his *personal* opinion — giving his personal opinions "much weight . . . when they should properly carry none." *Berger,* 295 U.S. at 88.

"The use of such tactics is inexcusable and causes this Court to view with a jaundiced eye convictions obtained where such obviously inappropriate methods have been employed." *Anchondo-Sandoval*, 910 F.2d at 1238.  Further exacerbating the improper argument's prejudicial effect is that defense counsel's closing argument neither provoked nor invited the prosecutor's misconduct. *See United States v. Canales*, 744 F.2d 413, 424 (5th Cir. 1984) (explaining that the prosecutor's alleged misconduct "must be considered in light of the argument to which it responded").  Defense counsel did not improperly bolster his client's credibility — he argued only that the evidence that she had consented to the search of the property and the tractor-trailer supported the inference that she had no knowledge of the drugs.  Nor did defense counsel question the credibility of the governmental agents.  Rather, he argued only that they conducted a less-than-thorough investigation.  As to Vasquez and Aguilar, defense counsel noted that their testimony left a number of questions unanswered, and questioned whether they had actually played some larger role in the offense.  He never argued that they had affirmatively lied in their testimony or in their out-of-court conduct. Thus, viewed in the context in which he made the statements, the prosecutor intended his argument to serve as a highly prejudicial injection of his personal opinion, and not merely as a response to defense counsel's arguments. *See United States v. Fields*, 72 F.3d 1200, 1207 (5th Cir. 1996) ("The magnitude of the

No. 07-41041

prejudicial effect is tested by looking at the prosecutor's remarks in the context of the trial and attempting to elucidate their intended effect.").[16]

The prosecutor attacked Delgado's credibility even though she had exercised her Fifth Amendment right not to testify at trial and to hold the Government to its burden of proof. The credibility of a non-testifying defendant is generally irrelevant to guilt: "[C]haracter is not an issue unless [the defendant] chooses to make it one." *Greer v. United States*, 245 U.S. 559, 560 (1918). "Unless and until the accused puts his character at issue by giving evidence of his good character or by taking the stand and raising an issue as to his credibility, the prosecutor is forbidden to introduce evidence of the bad character of the accused simply to prove that he is a bad man likely to engage in criminal conduct." *United States v. Wright*, 489 F.2d 1181, 1186 (D.C. Cir. 1973)).[17]   By challenging the veracity of

---

[16] The dissent dismisses the prosecutor's remark as the product of "clumsy language." Dissent at 12. We discern absolutely no clumsiness or inadvertence in the prosecutor's direct attack on Delgado's credibility (and find it difficult to believe that a prosecutor would be so clumsy given our clear disapproval of such arguments). But, even so, clumsiness would not excuse the remark's impropriety. "A prosecutor's duty in closing arguments is to be scrupulous and to avoid all efforts to obtain a conviction by going beyond the evidence before the jury to by putting the sanction of his office behind the testimony of the witnesses." *United States v. Dorr*, 636 F.2d 117, 120 (5th Cir. 1981).

The dissent also takes issue with, in its words, our "especially inappropriate" citation to *Anchondo-Sandoval*. In that case, the prosecutor argued: "I am going to tell you my feelings in this case — the defendant in this case is one of the most artful liars I have ever met." 910 F.2d at 1237. We concluded that this remark was improper but did not affect the defendant's substantial rights because the district court delivered a "proper cautionary instruction." *See id.* at 1238. In the instant case, and as the dissent agrees, the district court did not deliver an effective cautionary instruction. Moreover, in *Anchondo-Sandoval* we declined to reverse based on the prosecutor's improper comments alone, whereas in this case we consider the prosecutorial misconduct together with other prejudicial factors under the cumulative error doctrine.

[17] *Accord United States v. Lollar*, 606 F.2d 587, 588 (5th Cir. 1979) ("Although a criminal defendant cannot be compelled to take the stand in his own defense, *once he chooses to testify* 'he places his credibility in issue as does any other witness.'" (emphasis added)

No. 07-41041

Delgado's out-of-court statements, although she did not put her credibility at issue by testifying, the prosecutor "attempted to obtain the effect of impeachment even though [the defendant] did not testify." *United States v. Beeks*, 224 F.3d 741, 746 (8th Cir. 2000). And the prosecutor's misconduct jeopardized Delgado's valuable Fifth Amendment rights: "[S]tatements by the prosecutor during trial [concerning the defendant's non-testimonial conduct], or the fear of such statements in closing argument, will tend to eviscerate the right to remain silent by forcing the defendant to take the stand in reaction to or in contemplation of the prosecutor's comments. . . . While this pressure to testify may well be the exception, there is no reason for use of such comments that would justify even the slight opening of the door to an invasion of constitutional rights." *United States v. Schuler*, 813 F.2d 978, 981-82 (9th Cir. 1987).

While wrongfully attacking Delgado's credibility, the prosecutor improperly bolstered the credibility of the Government's key witness, Vasquez. The prosecutor, immediately before stating that Delgado had lied, also told the jury that Vasquez is "not a permanent snitch. He's not one of those individuals that makes his living providing information." "When a prosecutor vouches for government witnesses, it provides the witnesses with the 'imprimatur of the Government, and may induce the jury to trust the Government's judgment rather than its own view of the evidence.'" *United States v. Martinez-Larraga*, 517 F.3d 258, 271 (5th Cir. 2008) (quoting *United States v. Young*, 470 U.S. 1, 18-19 (1985)). Here, the prosecutor's characterization of Vasquez as "not a permanent snitch" carried the implication that he was giving the jury inside information about the nature of Vasquez's relationship with the government. The prosecutor thus

(quoting *United States v. Jackson*, 588 F.2d 1046, 1055 (5th Cir. 1979))).

No. 07-41041

multiplied the prejudicial effect of his misconduct by contrasting and juxtaposing his improper bolstering of Vasquez's credibility with his wrongful attack on Delgado's credibility.[18]

Despite the clearly improper argument and defense counsel's contemporaneous objection, the district court gave *no* curative instruction to mitigate the prejudice caused by the misconduct. The district court only sustained defense counsel's objection, and gave no explanation as to why it sustained the objection or how the jury should treat the improper argument. Thus, "[t]he damaging effect of these remarks was not neutralized by the trial court's instructions." *United States v. Murrah*, 888 F.2d 24, 28 (5th Cir. 1989). *See id.* (reversing a conviction based on improper prosecutorial arguments where the district court gave no effective curative instruction); *United States v. McPhee*, 731 F.2d 1150, 1153 (5th Cir. 1984) (same).

The government argues that the district court's general charge to the jury, given well *before* the attorneys' closing arguments and the prosecutorial misconduct, mitigated any prejudice caused by the improper argument. We disagree; these generic instructions delivered before the misconduct were "grossly inadequate under the circumstances" to neutralize the misconduct's prejudicial

---

[18] The dissent argues that the Government's bolstering of Vasquez's credibility was responsive to defense counsel's attacks on Vasquez's credibility. Defense counsel argued that Vasquez's testimony left many questions unanswered, and that those gaps raised the possibility that Vasquez may have had a larger role in the purported conspiracy than the prosecution claimed. These statements are a far cry from the type of credibility-attacking arguments that would permit the prosecutor to engage in otherwise improper witness bolstering. *Compare United States v. Cotton*, 631 F.2d 63, 66 (5th Cir. 1980) (concluding that the prosecution was permitted to bolster the credibility of its witnesses because "defense counsel in his final argument had attempted to portray the [government's witnesses] as liars due to their desire to convict Cotton" and "[d]efense counsel also referred to cover up attempts by the government").

effect. *McPhee*, 731 F.2d at 1153. In these circumstances, a generic instruction pertaining to all attorneys' statements given in the court's pre–closing argument instructions — thus provided well before any closing argument had been made or any prosecutorial misconduct had occurred, rather than contemporaneously with or immediately after that misconduct — was insufficient to mitigate the prejudice of the prosecutor's highly inappropriate remark. *See United States v. Carter*, 236 F.3d 777, 787 (6th Cir. 2001) (holding that the court's general charge that the lawyers' arguments are not evidence did not cure the prejudice caused by the prosecutor's improper remark because "it was made along with all other routine instructions for evaluating the evidence presented at trial" and "there was nothing directly linking this jury instruction to the prosecutor's misconduct"); *United States v. Watson*, 171 F.3d 695, 701 (D.C. Cir. 1999) (granting new trial based on improper prosecutorial argument where "the government [could] point to nothing by way of mitigation of the prejudice beyond the standard instructions that the opening and closing arguments of counsel are not evidence and that a lawyer's question is not evidence"); *United States v. Forlorma*, 94 F.3d 91, 95 (2d Cir. 1996) (finding that the district court failed to issue an appropriate curative instruction, even though it sustained defense counsel's objection to the improper prosecutorial argument and gave a general charge, because "we cannot be confident that the judge's unexplained ruling dispelled the misperception that was likely caused by" the prosecutor's misconduct); *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) (concluding that a general instruction to the jury that it was the sole judge of credibility was not sufficient to "neutralize the harm" of the prosecutor's improper statements bolstering the credibility of the government's witnesses because "they did not mention the specific statements of the prosecutor and were

not given immediately after the damage was done"); *Newlon v. Armontrout*, 885 F.2d 1328, 1337 (8th Cir. 1989) ("The State's argument that the standard jury instruction that statements made by counsel during opening and closing argument are not evidence cures any error made by the prosecutor is without merit. Such a broadly sweeping rule would permit *any* closing argument, no matter how egregious."); *United States v. Carroll*, 678 F.2d 1208, 1210 (4th Cir. 1982) (finding that the district court's curative instruction did not cure the prejudice caused by the prosecutor's misconduct because it "did not immediately follow on the heels of the prosecutor's improper argument"). The district court's generic charges — delivered before the attorneys' closing arguments, well before the prosecutor's improper remark in rebuttal, and not specifically directed at curing the potentially great prejudice it caused — could not serve as curative instructions.[19]

---

[19] The dissent apparently agrees that the district court's general instructions to the jury, delivered before closing argument, were not sufficient to cure the prosecutor's misconduct. Nonetheless, the dissent argues that defense counsel's failure to specifically request a cautionary instruction (despite having contemporaneously objected to the prosecutor's improper remark) relieved the district court of its obligation to effectively instruct the jury to disregard the prosecutor's statement. In particular, the dissent cites to *United States v. Sanchez*, 961 F.2d 1169 (5th Cir. 1992), which held that a prosecutor's rather innocuous disparagement of defense counsel's credibility was not reversible misconduct. As part of our analysis in *Sanchez*, we noted that defense counsel did not request a curative instruction, although he did object to the remark. Counsel's failure to specifically request a curative instruction alone was not deemed dispositive in *Sanchez*, *see id.* at 1176, and the dissent offers no reason why it should be dispositive here. Further, unlike in *Sanchez*, the other prongs of the misconduct analysis — i.e., the magnitude of the prejudice caused and the other evidence of guilt — as applied in this case weigh heavily in the defendant's favor. *See id.*

No. 07-41041

Knowledge was an essential element of both charges against Delgado.[20] The prosecutor's improper argument directly spoke to and prejudicially imputed these knowledge elements to Delgado. Agent Spivey testified that Delgado told him that she did not have the keys to the tractor-trailer, and that when confronted with the results of the search of her property, Delgado denied knowledge of the marijuana and said it belonged to somebody else. The prosecutor peremptorily told the jury that Delgado had lied to the federal agents during and after their search of her house and truck when she denied knowing about the marijuana. By expressing this personal opinion, the prosecutor invited the jury to believe that he had knowledge about this subject, by virtue of his office, that was superior to and more compelling than the testimony of the witnesses appearing at trial. Thus, in addition to impugning Delgado's credibility, the prosecutor used his personal opinion to convince the jury that Delgado knew about the marijuana. The prosecutor's misconduct is especially troublesome because it was used to undercut and unfairly prejudice Delgado's only theory of defense — lack of proof of her knowledge that illegal drugs were in the truck parked at her house.[21]

---

[20] *See United States v. Sanchez-Sotelo*, 8 F.3d 202, 208 (5th Cir. 1993) ("As to the substantive offense of possession, 'the government must prove beyond a reasonable doubt that the defendant[] knowingly possessed [the controlled substance] and intended to distribute it.'" (quoting *United States v. Valdiosera-Godinez*, 932 F.2d 1093, 1095 (5th Cir. 1991))); *id.* ("With regard to the conspiracy offense, the government must prove beyond a reasonable doubt: (1) the existence of an agreement between two or more persons to violate the narcotics laws; (2) *the defendant knew of the conspiracy*; and (3) the defendant voluntarily participated in the conspiracy." (emphasis added)).

[21] The dissent claims that the jury would not have understood the prosecutor to be conveying his knowledge of information outside the evidence. The prosecutor conveyed such knowledge by placing his personal opinion attacking Delgado's credibility before the jury, because the opinion itself is outside of the evidence properly considered by the jurors. *See United States v. Garza*, 608 F.2d 659, 663 (5th Cir. 1979). That the jury will ascribe special importance to the prosecutor's opinion is inherent by virtue of his special position of trust: "It

No. 07-41041

The prosecutor challenged Delgado's credibility although she didn't take the witness stand or otherwise put her credibility at issue; the district court sustained the objection but did not grant a mistrial or instruct the jury to disregard the prosecutor's prejudicial remarks; any supposedly curative instructions came only in the form of the district court's general charge to the jury, delivered long before the prosecutor's misconduct; and the misconduct directly related to an essential element of the charges against Delgado and directly undermined Delgado's only defense — that the government had failed to prove beyond a reasonable doubt that she had actual knowledge that unlawful drugs were hidden in the locked truck parked at her house.   For these reasons, we conclude that the prosecutor's improper attack on Delgado's credibility had a significant impact on the fairness of the trial which, when combined with the other errors set forth below, requires us to vacate Delgado's convictions under the cumulative error doctrine.

**B.**

The effect of the prosecutor's improper and prejudicial argument was compounded by the misconduct of a government witness, Agent Spivey of ICE, who gave nonresponsive testimony linking Delgado to extrinsic, uncharged drug trafficking offenses.   The jury had heard evidence of the undisputed fact that

---

is fair to say that the average jury, in a greater or less degree, has confidence that [the obligation to do justice], which so plainly rest[s] upon the prosecuting attorney, will be faithfully observed.   Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88 (1935). *See also United States v. Young*, 470 U.S. 1, 19 (1985) (explaining that the prosecutor's expression of personal opinion "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence").

No. 07-41041

Delgado operated TJ Trucking. Agent Spivey's testimony on cross-examination, in relevant part, was as follows:

Q     Did you all try to investigate [Delgado's] income to see, you know, how much money she makes . . . or —

A     No, sir.

Q     Did you all investigate I believe it was TJ Trucking?

A     We had prior knowledge of TJ Trucking being involved in narcotics trafficking, yes.

Thus, Agent Spivey, uninvited by defense counsel's questioning, volunteered a nonresponsive answer in which he made the unfairly prejudicial claim that Delgado's company had been involved in previous, uncharged criminal activity, extrinsic to the crimes for which Delgado was on trial.

Agent Spivey's answer was, as the district court said, "highly prejudicial." A governmental officer's accusation that a defendant has committed other crimes presents an inherent risk of prejudice because it "might lead a jury to convict a defendant not of the offense charged, but instead of an extrinsic offense." *United States v. Sumlin*, 489 F.3d 683, 689 (5th Cir. 2007) (citing *United States v. Ridlehuber*, 11 F.3d 516, 521 (5th Cir. 1993)). "'This danger is particularly great where . . . the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged.'" *Ridlehuber*, 11 F.3d at 521 (quoting *United States v. Beechum*, 582 F.2d 898, 914 (5th Cir. 1978)). Agent Spivey's testimony directly implicated TJ Trucking, and therefore Delgado, in narcotics trafficking, even though there was no evidence that Delgado had ever been convicted of or charged with such an offense, and without otherwise meeting the requirements of Federal Rule of Evidence 404(b) for the admission of evidence of other crimes, wrongs, or

32

No. 07-41041

acts. The district court responded with an immediate curative instruction,[22] but we cannot overlook the prejudicial effect this testimony may have had in combination with the other unfair elements of Delgado's trial. "[A]s this Court observed in overturning a conviction because of improper prosecutorial comment, despite a curative instruction, once such statements are made, the damage is hard to undo: 'Otherwise stated, one cannot unring a bell; after the thrust of the saber it is difficult to say forget the wound; and finally, if you throw a skunk into the jury box, you can't instruct the jury not to smell it.'" *United States v. Garza*, 608 F.2d 659, 666 (5th Cir. 1979) (quoting *Dunn v. United States*, 307 F.2d 883, 886 (5th Cir. 1962)).

## C.

In addition to the effects of the prejudicial misconduct of two members of the prosecution team as set forth above, the trial's fairness was further impaired by the district court's instructions, which created a serious risk that the jury may have misunderstood what the government was required to prove in order to support a conviction on the charge of possession with intent to distribute. In the general charge to the jury, delivered before closing arguments, the district court instructed:

> The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.
>
> You may find that the Defendant had knowledge of a fact if you find that the Defendant deliberately closed her eyes to what would otherwise have been obvious to her. While knowledge on the part of

---

[22] The court told the jury: "Members of the jury, I'm going to ask you to strike and disregard that last answer that was given. It's to have no role in your deliberations whatsoever. You're to pretend as though you didn't hear that. Disregard it completely."

No. 07-41041

> the Defendant cannot be established merely by demonstrating that the Defendant was negligent, careless, or foolish, knowledge can be inferred if the Defendant deliberately blinded herself to the existence of a fact.

To convict Delgado of possession with intent to distribute, the government was required to prove beyond a reasonable doubt, inter alia, that she "knowingly" possessed the marijuana. *See* 21 U.S.C. § 841(a)(1); *United States v. Villarreal*, 324 F.3d 319, 324 (5th Cir. 2003). A defendant is guilty under § 841(a)(1) only if he or she had actual knowledge, i.e., "'he was aware that he possessed some controlled substance.'" *See United States v. Patino-Prado*, 533 F.3d 304, 309 (5th Cir. 2008) (quoting *United States v. Gonzales*, 700 F.2d 196, 200 (5th Cir. 1983)). However, in "rare" circumstances, the district court may instruct the jury on "deliberate ignorance," thereby "permitt[ing] the jury to convict a defendant without a finding that the defendant was actually aware of the existence of illegal conduct." *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990).

Deliberate ignorance operates as an exception to the usual requirement of actual knowledge, reserved for the few instances where "'the defendant *choos*[*es*] to remain ignorant so that he can plead lack of positive knowledge in the event he should be caught.'" *See id*. (emphasis added) (quoting *United States v. Restrepo-Granda*, 575 F.2d 524, 528 (5th Cir. 1978)). Thus, a defendant has the requisite guilty knowledge where she "*consciously* attempted to escape confirmation of conditions or events he strongly suspected to exist." *Id.* In other words, "the required state of mind" for deliberate ignorance "differs from positive knowledge only so far as necessary to encompass a calculated effort to avoid the sanctions of the statute while violating its substance. 'A court can properly find wilful blindness only where it can almost be said that the defendant actually knew.'"

34

No. 07-41041

*United States v. Jewell*, 532 F.2d 697, 704 (9th Cir. 1976) (en banc) (quoting Glanville Williams, *Criminal Law* § 57, at 159 (2d ed. 1961)).

Before delivering a deliberate ignorance charge, the district court must exercise great care to ensure that the evidence establishes a factual predicate supporting the instruction and to give the instruction only when such a predicate exists. *See Lara-Velasquez*, 919 F.2d at 950. "The circumstances which will support the deliberate ignorance instruction are rare. The evidence at trial must raise two inferences: (1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *Id.* at 951. *See also United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) ("[T]here must be evidence that the defendant (1) was aware of a high probability of a disputed fact and (2) deliberately avoided confirming that fact."). Evidence which raises only the inferences that the defendant had either actual knowledge or no knowledge at all does not support giving a deliberate ignorance instruction. *See United States v. Saucedo-Munoz*, 307 F.3d 344, 349 (5th Cir. 2002). Our review of the instruction is "necessarily an intensive endeavor," requiring that the court "examine the totality of the evidence." *See Lara-Velasquez*, 919 F.2d at 952.

To supply the required factual predicate, the evidence must raise the inference that the defendant "purposely contrived to avoid learning of the illegal conduct." *Lara-Velasquez*, 919 F.2d at 951. This requirement reflects the "*sine qua non* of deliberate ignorance," which is "'the *conscious* action of the defendant — the defendant *consciously* attempted to escape confirmation of conditions he [subjectively] strongly suspected to exist.'" *United States v. Mendoza-Medina*, 346 F.3d 121, 133 (5th Cir. 2003) (quoting *Lara-Velasquez*, 919 F.2d at 951). It is not

35

No. 07-41041

enough that the defendant merely failed to investigate; rather, the evidence must show that the "defendant deliberately avoided acquiring knowledge of the crime being committed by cutting off his curiosity through an effort of the will." *United States v. Leahy*, 464 F.3d 773, 796 (7th Cir. 2006). This requirement is satisfied where "the circumstances of the defendant's involvement in the criminal offense [were] *so overwhelmingly suspicious* that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *Lara-Velasquez*, 919 F.2d at 952. *See also Svoboda*, 347 F.3d at 481; *United States v. de Francisco-Lopez*, 939 F.2d 1405, 1412 (10th Cir. 1991) (explaining that the deliberate ignorance instruction is supported only where "clues of association with the crime charged were so obvious that the clues, combined with suspicion, necessarily implicated the defendant").

In the present case, there was no circumstantial evidence indicating that Delgado had contrived to remain ignorant of the drugs in the truck on her premises. Nor was there any evidence that Delgado had come into possession of the marijuana under suspicious circumstances suggesting her contrived ignorance. The government, on appeal, argues that the instruction was justified by Delgado's statements to investigating agents that she did not know the marijuana was in the truck, that she did not have the key to the truck in her possession at that time, that she did not have a phone number for her truck driver, and that more than one driver had worked for her. We disagree. This evidence did not suggest a contrivance or calculation by Delgado to remain ignorant of whether there were drugs in the truck. It only supports the inferences that she either had actual knowledge (if she was lying) or had no knowledge (if she was telling the truth). Thus, the evidence did not support either of the two

36

No. 07-41041

elements of the required factual predicate for the deliberate ignorance instruction, *viz.*, that Delgado was subjectively aware of a high probability that marijuana was hidden in the truck, and that she deliberately contrived or arranged to avoid discovering or confirming that the marijuana was in the truck. As we have explained, evidence suggesting that "the defendant[] knew that his conduct was criminal and took elaborate measures to hide it" is not sufficient to support an instruction on deliberate ignorance; rather, such evidence is the "opposite" of purposeful contrivance to remain ignorant of a crime. *See United States v. Threadgill*, 172 F.3d 357, 369 (5th Cir. 1999). Therefore, the district court erred by instructing the jury on deliberate ignorance because the evidence failed to support an essential inference of contrivance by Delgado to avoid her own discovery or confirmation of the location of unlawful drugs in the parked truck.[23]

The district court's error in giving the deliberate ignorance instruction without the required factual predicate ran the high risk of allowing the jury to erroneously convict Delgado based on a belief that she was merely negligent or reckless in failing to learn of the marijuana, rather than that she had actual knowledge of it. *See Lara-Velasquez*, 919 F.2d at 951 ("Because the instruction permits a jury to convict a defendant without finding that the defendant was actually aware of the existence of illegal conduct, the deliberate ignorance

---

[23] The dissent claims that the erroneous instruction was harmless because there was substantial evidence that Delgado actually knew of the marijuana. But, even if this error was not harmful enough by itself to justify vacating Delgado's conviction — despite the fact that it effectively lowered the government's burden of proof as to Delgado's mental state — it is still proper to take it into account, together with other errors, under the cumulative error doctrine. *See United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998) ("[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal.").

No. 07-41041

instruction poses the risk that a jury might convict the defendant on a lesser negligence standard — that is, on the ground that the defendant *should* have been aware of the illegal conduct."); *see also United States v. Alston-Graves*, 435 F.3d 331, 340 (D.C. Cir. 2006) ("One problem with the various formulations of this instruction is that the jury might convict a defendant for acting recklessly . . . or even for acting negligently.  Negligence and recklessness are not the same as intentional and knowing conduct.").  Delgado's knowledge or lack of knowledge was the central factual issue at trial.  Thus, the erroneous instruction created a risk of jury confusion on a crucial matter and made it possible for the government to obtain a conviction without having to convince the jury beyond a reasonable doubt that Delgado had actual knowledge of the marijuana.

**D.**

The risk of confusion and error created by the deliberate ignorance instruction was further exacerbated by the district court's failure to clearly instruct the jury as to two key aspects of the law of conspiracy.  As explained above, a conspiracy conviction cannot be predicated on either a simple buyer-seller relationship or an agreement with a government informant who intends to frustrate the conspiracy's purpose.  The district court did not instruct the jury on either of these important points, even though the government presented no evidence that Delgado agreed to commit a crime (beyond a simple buyer-seller transaction) with anyone except the informant, who secretly intended to frustrate the ostensible agreement.  In *United States v. Sears*, 343 F.2d 139 (5th Cir. 1965), we held that a district court erred in failing to instruct the jury that a governmental informant cannot be a co-conspirator where, "in view of the posture of the evidence and the charge actually given by the court, the jury may well have

38

No. 07-41041

believed that it could convict" the defendant based on his agreement with the governmental informant. *See id.* at 142.[24]   In this case, the district court's failure to give clear instructions on the relevant principles of the law of conspiracy likely caused confusion, which — together with the wrongful introduction of testimony regarding extrinsic offenses by TJ Trucking — may have led the jury to convict Delgado of both of the charges against her because she appeared to them to be a bad person.

## E.

Fulfilling our obligation to assess the effect of trial errors in the context of the trial as a whole,[25] we take note of one more unfair aspect of the proceeding:

---

[24] Notably, the dissent agrees that "[i]t would have been better for the district court to provide a *Sears* instruction." Dissent at 15. Nonetheless, the dissent would overlook the import of this failure because any error in failing to instruct in accordance with *Sears* "was far from egregious," apparently meaning that the error was not clear or obvious. We disagree. "An error is considered plain, or obvious, only if the error is clear under existing law." *United States v. Salinas*, 480 F.3d 750, 756 (5th Cir. 2007) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)). The district court's error was clear under *Sears* itself, which is factually indistinguishable from the instant case.

The dissent relies on *United States v. Slaughter*, 238 F.3d 580 (5th Cir. 2000) (per curiam). However, that case is easily distinguishable from the instant case because in *Slaughter*, "the Government . . . presented evidence at trial to establish a conspiracy existed which included Slaughter and five others who were not government agents or informants." *Id.* at 585. Here, given the absence of evidence that Delgado's relationship with either the source of the marijuana or its intended recipient went beyond a simple buyer-seller relationship, the jury may very well have mistakenly believed it could convict Delgado of conspiring with Vasquez, the government informant.

[25] *See United States v. Diharce-Estrada*, 526 F.2d 637, 642 (5th Cir. 1976) ("Based upon the combination of errors *and prejudicial circumstances* recited, this court is left with the definite and firm conviction that [the defendant] did not receive a fair trial." (emphasis added)); *see also Taylor v. Kentucky*, 436 U.S. 478, 487 & n.15 (1978) (concluding that the "cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness"); *United States v. Rivera*, 900 F.2d 1462, 1477 (10th Cir. 1990) (en banc) ("Courts have . . . found fundamental unfairness when error is considered in conjunction with other prejudicial circumstances within the trial, even though

No. 07-41041

there is not a complete transcript of Delgado's trial. "It is . . . established beyond any shadow of doubt that a criminal defendant has a right to a record on appeal which includes a complete transcript of the proceedings at trial." *United States v. Selva* (*Selva II*), 559 F.2d 1303, 1305 (5th Cir. 1977) (citing *Hardy v. United States*, 375 U.S. 277 (1964)). To this end, the Court Reporter Act, 28 U.S.C. § 753, provides:

> Each session of the court and every other proceeding designated by rule or order of the court . . . shall be recorded verbatim by shorthand, mechanical means, electronic sound recording, or any other method, subject to regulations promulgated by the Judicial Conference and subject to the discretion and approval of the judge. . . . Proceedings to be recorded under this section include (1) all proceedings in criminal cases had in open court . . . .

28 U.S.C. § 753(b). The Act thus imposes a mandatory requirement that all criminal proceedings held in open court be recorded verbatim, *see United States v. Taylor*, 607 F.2d 153, 154 (5th Cir. 1979), although violations of the Act are not reversible *per se*, *see Selva II*, 559 F.2d at 1305-06 & n.5.

The transcript here is rife with omissions, totaling approximately 119 ellipses in the 491-page transcript of jury selection and the two-day trial. These omissions appear at key points in the proceedings, including voir dire, bench conferences concerning administrative matters and evidentiary objections, and closing arguments. These gaps in the record are made more serious by the fact that Delgado is represented by new counsel on appeal, who did not represent her

---

such other circumstances may not individually rise to the level of error."). The principle that the court may consider other prejudicial circumstances of the trial, which may not necessarily in themselves constitute error, is consistent with the requirement that we consider the errors in conjunction with the "record as a whole." *See Spence v. Johnson*, 80 F.3d 989, 1001 (5th Cir. 1996).

No. 07-41041

during the trial and is therefore potentially limited in her ability to present an effective appeal. The omissions likewise limit our own ability to fully assess the effects of each of the errors noted above, and to determine whether additional errors may also have occurred. The unlawful lack of a complete record of the trial in this case further exacerbates our lack of confidence in the verdict.

\* \* \*

The cumulative error doctrine recognizes that "an aggregation of non-reversible errors" can result in "a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998). "A claim of cumulative error is '*sui generis*;' we evaluate the number and gravity of the errors in the context of the case as a whole." *United States v. Valencia*, 600 F.3d 389, 429 (5th Cir.) (per curiam) (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993)), *cert. denied*, 131 S. Ct. 285 (2010). In this case, an aggregation of errors — a combination of misconduct by members of the prosecution team and erroneous and misleading jury instructions delivered by the court, as well as the unlawfully deficient transcript — deprived Delgado of a fair trial. The jury was asked to accept the prosecutor's personal opinion that Delgado knew of the marijuana in the truck and lied about it to the investigating officers; was exposed to a government agent's unfairly prejudicial allegation of an uncharged, extrinsic offense committed by Delgado; was given an instruction on deliberate ignorance which, because of the complete absence of a factual predicate for it, invited the jury to convict her based solely on her negligence; and was not instructed that Delgado could not be convicted of conspiracy based on either her unconsummated agreement with a government informant or her mere buyer-seller relationship with others. The cumulative impact of these significant errors,

41

No. 07-41041

together with the jury's false belief that Delgado had committed the conspiracy offense, clearly deprived her of her right to a fundamentally fair trial on the charge of possession with intent to distribute marijuana.

## IV.  CONCLUSION

In summary, the government's case against Delgado was predicated on the testimony of a repeat paid informant who testified that she arranged to transport a load of marijuana to North Carolina.  The tapes of Delgado's conversations with the informant, Vasquez, did not in themselves establish her guilt; rather, the government relied on Vasquez's testimony about the hidden meaning of their taped conversations in Spanish code, and about other unrecorded conversations. When government agents came to Delgado's home, she allowed them to search her property and the locked TJ Trucking rig parked there; the agents found marijuana concealed in the sleeper cab of a truck, but no witness testified to having seen Delgado possess the marijuana or enter the truck.  At trial, Delgado's counsel argued that the evidence left many unanswered questions, that the informant's testimony was untrustworthy, and that Delgado's consent to search showed that she did not know the marijuana was in the truck.

Even if the jury fully believed the informant's testimony, the government still failed to put on any evidence that would be legally sufficient to convict Delgado of conspiracy.  The court did not instruct the jury that it could not convict Delgado of conspiring with Vasquez because he was a government agent who intended to frustrate the purpose of the alleged agreement between them. Likewise, the court failed to instruct the jury that it could not convict Delgado of conspiracy based merely on her conduct as a buyer or seller.  There was no

42

No. 07-41041

evidence that she entered into a conspiratorial agreement with either the unidentified supplier or the unidentified prospective recipient, and hence no evidence that Delgado's relationship with either of them involved anything more than a single instance of acquisition and contemplated selling. The evidence did not show that anyone other than Vasquez, the government informer, entered into an agreement with Delgado to commit a crime beyond the buyer-seller relationship. Therefore, the evidence was insufficient to support the conspiracy conviction.

Furthermore, a series of other significant errors combined to deprive Delgado of her right to a fair trial. During closing argument, the prosecutor improperly declared his personal opinion that Delgado had lied to federal agents when she said she did not know about the marijuana. A government agent made an uncalled-for and unfairly prejudicial accusation on the witness stand, when the agent stated that Delgado's company, TJ Trucking, had been involved in uncharged, extrinsic prior offenses. And the court erroneously gave the jury an instruction on deliberate ignorance, without a proper factual predicate, which created a serious risk that the jury may have convicted Delgado for her negligence, *viz.*, on the basis of a belief that she merely should have known about the marijuana, rather than on the basis of a finding of actual knowledge as required by law. Under the circumstances of this case, these errors require us to apply the cumulative error doctrine and vacate Delgado's conviction and sentence for possession of marijuana with intent to distribute.

Because we conclude that the evidence was insufficient to support the conspiracy charge, that charge must be dismissed; however, Delgado can be re-tried on the charge of possession with intent to distribute. Accordingly, we

43

No. 07-41041

VACATE Delgado's convictions and sentences, DISMISS the charge of conspiracy to possess marijuana with intent to distribute, and REMAND the case to the district court for further proceedings consistent with this opinion.

No. 07-41041

EDITH BROWN CLEMENT, Circuit Judge, dissenting:

The district court committed no reversible error, and the jury's verdict should be affirmed. In holding otherwise, the panel majority ignores the substantial evidence supporting Delgado's conspiracy conviction and reaches outside the issues presented on appeal and outside the law of this circuit. The panel majority falls back on a nebulous theory of cumulative error that treats three purported mistakes—each minor at best, and only one objected to below—as collectively depriving Delgado of her constitutional right to a fair trial. Its conclusion that the trial violated the Fifth Amendment is wholly untethered from our caselaw. The cumulative error doctrine applies only in the rare case in which errors "so fatally infect the trial that they violate[] the trial's fundamental fairness." *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007) (quotation omitted). This court has never vacated a verdict for cumulative error on such weak grounds.

To fit this case into our cumulative error jurisprudence, the majority finds error where none exists and overstates the harm allegedly caused by each error it finds. The result is a decision that makes a muddle of this court's prosecutorial misconduct, conspiracy, and cumulative error doctrines.

## A.    The facts

The majority's analysis overlooks the overwhelming evidence of Delgado's guilt, none of which she rebutted. The evidence showed that Delgado offered Vasquez $10,000 to commingle approximately 500 pounds of marijuana with a truckload of broccoli so that the drugs could be transported from the Rio Grande valley in Texas to a receiver in North Carolina. A taped conversation confirmed that, in order to disguise the nature of the shipment, Delgado asked Vasquez to

45

prepare two bills of lading—one for North Carolina, where the marijuana was bound, and one for New York, where the broccoli was bound.

In the same taped conversation, Delgado and Vasquez discussed, in guarded language that Vasquez explicated on the stand, the number of boxes of broccoli that would have to be opened to hold the marijuana; that the truck's interior would have to be heated to melt off some of the ice in which the broccoli was packed, so that the increased weight of the marijuana would not arouse suspicion at a weigh station; and the possibility that the marijuana would be loaded at a different warehouse to avoid a run-in with Vasquez's supervisor. The shipment was cancelled after, as Vasquez explained, "the person who was going to work with [Delgado]"—that is, the intended recipient—was arrested. Delgado called Vasquez to tell him that the shipment was off, that the bundles of marijuana were still in the cab of her truck, and that she was waiting until night to unload them and return them to an unnamed supplier.

Acting on this information from Vasquez, government agents went to Delgado's securely fenced and gated property. Delgado eventually consented to a search. Consistent with Vasquez's report, the agents found a tractor-trailer parked in the yard. Delgado told the agents that she did not have the keys to its locked cab; she claimed they were with the driver. (Albert Aguilar, Delgado's driver, consistently testified that the keys to the tractor-trailer were either kept in the truck or given directly to Delgado, that he knew of only one set of keys, and that he did not have them at the time the agents searched the truck.) Delgado also told the agents she could not contact the driver because she did not have his telephone number. The agents eventually were able to open the tractor-trailer cab. In its sleeper berth, they found thirty-four bundles of marijuana, weighing 507

No. 07-41041

pounds. Delgado expressed no surprise at the discovery but denied knowing that the marijuana was in the cab. She blamed her "drivers," whose "names" she claimed she could not recall. In fact, Delgado employed only one driver—Aguilar.

Around the time the cab was opened, another agent entered a room in which Delgado kept approximately ten large, threatening dogs chained to the walls. Inside a cabinet, he found a garbage bag filled with wrapping material that smelled of marijuana and held what appeared to be marijuana seeds and residue. Delgado expressed no surprise at this discovery, either; she told the agent that she thought the bags had been used to wrap potting soil. She also said they might have been placed in the house by a man named Peter, who worked for her. She told the agent she did not know Peter's last name and did not have his contact information. In addition to the drugs, agents seized a substantial amount of ammunition and four firearms from Delgado's residence, including a loaded TEC-9.[1] Vasquez testified that Delgado called him after the search and expressed her anger that the agents had seized the drugs and guns.

**B.    Sufficiency of the evidence**

The panel majority's holding that the evidence merely demonstrated a buyer-seller relationship and was not sufficient to show a conspiracy  marks out new territory in our law on conspiracy. It is wrong for a number of reasons. Delgado did not raise the buyer-seller exception or challenge the sufficiency of the evidence at trial.[2] *Nor did she raise these issues on appeal.* Her failure to

---

[1] Agent Spivey testified that the TEC-9 is a weapon of choice for many drug traffickers.

[2] Both her motion for a judgment of acquittal at the close of the government's evidence and her counsel's closing argument relied solely on her claimed lack of knowledge.

Delgado also did not request a buyer-seller instruction at trial. Even if she had, such an instruction would not have been necessary. "We have consistently held that an adequate

No. 07-41041

challenge the sufficiency of the evidence on appeal waives the issue. *United States v. Green*, 964 F.2d 365, 371 (5th Cir. 1992). In fact, while Delgado argued that the evidence of conspiracy was thin, she conceded in her opening brief that there was some evidence she worked with co-conspirators.

The majority's expansive application of the buyer-seller exception is without precedent in this circuit. The evidence at trial demonstrated much more than just a buyer-seller scenario; substantial evidence allowed the jury to infer that Delgado was an integral part of a high-volume marijuana trafficking operation, not a participant in a "typical buy-sell scenario, which involves a casual sale of small quantities of drugs." *United States v. Medina*, 944 F.2d 60, 65 (2d Cir. 1991).[3] The majority's contention that "there was no evidence from which a jury could rationally infer beyond a reasonable doubt that Delgado had agreed with anyone

---

instruction on the law of conspiracy precludes the necessity of giving a buyer-seller instruction, even where the evidence supports the defense." *United States v. Mata*, 491 F.3d 237, 241 (5th Cir. 2007). "So long as the jury instruction given by the court accurately reflects the law on conspiracy, this court will conclude that the buyer-seller relationship has also been adequately covered." *United States v. Asibor*, 109 F.3d 1023, 1035 (5th Cir. 1997); *see also United States v. Thomas*, 12 F.3d 1350, 1365-66 (5th Cir. 1994). "We conclude that if the evidence showed that a defendant is merely a buyer or seller, the elements necessary to prove a conspiracy would be lacking, and a not guilty verdict would result." *United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993). Here, the jury was properly instructed on the law of conspiracy; its guilty verdict shows that it did not consider the trafficking here to be a series of mere buyer-seller transactions.

[3] The Second Circuit's opinion in *United States v. Parker* contains a thorough explanation of the rationale behind the narrow buyer-seller exception. 554 F.3d 230, 234 (2d Cir. 2009). As the *Parker* court notes, the exception, at its core, "distinguish[es] between transfer of an illegal drug and the acquisition or possession of the drug" by a street-level user. *Id.*; *see also United States v. Ivy*, 83 F.3d 1266, 1285-86 (10th Cir. 1996) ("[T]he purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors . . . .").

No. 07-41041

other than Vasquez . . . to distribute or possess with intent to distribute marijuana" is factually incorrect.  Maj. Op. at 16.

The evidence showed that Delgado arranged to ship more than 500 pounds of marijuana from the Rio Grande valley to a recipient in North Carolina.  It also showed that she worked with a supplier who dealt in substantial quantities of the drug.[4]  After the intended recipient was arrested but before the government agents interrupted her plan, Delgado reported to Vasquez that she was preparing to return the marijuana to the supplier.  Delgado's plan to return the 500-pound cache of drugs shows that she was not in a typical buy-sell relationship with her supplier.  Another fact allows a similar inference that Delgado was a classic organizational trafficker rather than a mere buyer or seller: Delgado told Vasquez that prior to shipping the marijuana, she was waiting to be paid money—"which, in turn, she was going to use to pay us off once the marijuana had been loaded inside the boxes."  That Delgado was fronted money in advance takes this deal out of the realm of the "typical buy-sell scenario."[5]  *United States v. Hawkins*, 547 F.3d 66, 72 (2d Cir. 2008); *see also United States v. Posada-Rios*, 158 F.3d 832, 860 (5th Cir. 1998) (holding that evidence that a defendant purchased drugs on consignment is "strong evidence of membership in a conspiracy because it indicates a strong level of trust and an ongoing, mutually dependent relationship."

---

[4] The government was not required to identify either co-conspirator by name.  *See United States v. Lance*, 536 F.2d 1065, 1068 (5th Cir. 1976).

[5] Additionally, the plan to ship the marijuana required advance logistical arrangements.  The Second Circuit, for one, does not apply the buyer-seller exception "where . . . there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use. Under such circumstances, the participants in the transaction may be presumed to know that they are part of a broader conspiracy." *Medina*, 94 F.2d at 65-66; *see also United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005).

No. 07-41041

). A mere buyer or seller is highly unlikely to deal in marijuana in quarter-ton increments, have an arrangement with her supplier whereby a significant amount of marijuana is freely returnable, receive money in advance of shipment, *and* construct an elaborate plan to ship the drugs across the country. As the majority recognizes, the buyer-seller exception "does not protect either the seller or buyer from a charge they conspired together to transfer drugs if the evidence supports a finding that they shared a conspiratorial purpose to advance other [drug] transfers." Maj. Op. at 11 (quoting *United States v. Parker*, 554 F.3d 230, 235 (2d Cir. 2009)). Sufficient evidence existed for a rational jury to find that Delgado participated in a conspiracy. The majority's characterization of the scheme strains credulity.

The majority cites a number of cases to support its theory.[6]  It cites none with analogous facts, and nothing from this circuit supports its conclusion. Delgado's able appellate counsel did not make a buyer-seller argument. The majority raises this waived argument *sua sponte* and in doing so, it has rewritten and greatly expanded this circuit's approach to the buyer-seller exception.

## C.    Cumulative error

### i.    Prosecutorial misconduct

A key component of the majority's cumulative error holding is a supposed instance of prosecutorial misconduct.[7]  The kitchen-sink analysis undertaken by the majority—which appears to have discovered every variety of prosecutorial misconduct extant in our jurisprudence within the statement in question—is

---

[6] In particular, the majority relies on several cases from the Seventh Circuit, which employs a buyer-seller doctrine far more expansive than our own.

[7] The opinion could be read to hold in the alternative that prosecutorial misconduct alone justifies reversal.  *See* Maj. Op. at 23-24.

No. 07-41041

fatally flawed in at least two respects: it misreads the context of the statement and misapplies the substantive law.

This is what the prosecutor said at the end of his closing rebuttal:

Talk about motive to lie, ladies and gentlemen. Who has the motive to lie here? The driver? No. He's working all around. Mr. Vasquez? No. He's in Laredo. He's not a permanent snitch. He's not one of those individuals that makes his living off providing information. He's provided it twice in the past. The agents? You're going to blame the agents for all this? Whose [sic] got the motive to lie here? It's the Defendant, and she's done so. She did so to these agents.

Defense counsel objected to the statement, noting that Delgado "has not testified . . . in this case." The judge sustained the objection. No curative instruction was requested, and none was given *sua sponte*, although the judge had instructed the jury prior to the closing arguments that the lawyers' statements did not constitute evidence.

The context is crucial to determining the effect of the statement.[8] The defense rested without putting on any witnesses. After the judge charged the jury, the prosecutor explained in his initial closing argument how Delgado's conduct met each element of the charged offenses. There were no objections.

Defense counsel began his closing by acknowledging that "[t]hings look real bad for Ms. Delgado." He accused two of the government agents of "just assum[ing] she's guilty" and blamed Agent Spivey for suspecting that Delgado possessed the marijuana even though "[t]here's nothing done scientifically in this case." At the same time, defense counsel attempted to paint Delgado as open and straightforward in her dealings with the government agents. He argued that the

---

[8] *See United States v. Wyly*, 193 F.3d 289, 299 (5th Cir. 1999) ("The magnitude of the prejudicial effect is tested by looking at the prosecutor's remarks in the context of the trial in which they were made and attempting to elucidate their intended effect.") (quotation omitted).

51

No. 07-41041

evidence indicated that Delgado's "demeanor . . . is, come on in.  She unlocks everything.  She shows them everything.  So, nothing she's holding back." Delgado, he contended, "never had any reason not to let them see everything . . . . She didn't hide anything."[9]  Defense counsel then shifted to an attack on the credibility of the government's other witnesses.  He suggested the possibility that "Mr. Vasquez is controlling" and that Delgado was being set up.  He pointed out inconsistencies in Aguilar's statements and hinted that Aguilar should have been considered a suspect.

In his rebuttal, the prosecutor addressed the defense's arguments head-on. He specifically focused on the assertion that Delgado had been completely forthcoming with the federal agents.  Delgado, he emphasized, cooperated in helping the government agents search every part of the property—with the notable exception of the tractor-trailer cab, the only locked item to which she claimed not to have the keys.  The prosecutor then outlined for the jury Delgado's dissembling statements about her truck driver and explained why the evidence showed that Delgado must have had the keys—the natural corollary being that she must have been lying to the federal agents about her access to the cab.  It was after this explanation that he made the contested statement.

The majority's conclusion that the prosecutor improperly vouched for Vasquez is incorrect.  Defense counsel implied that Vasquez was behind the whole marijuana shipping operation and that his status as an informer called his

---

[9] In fact, the agents waited a significant amount of time before Delgado met them at the gate.  She then insisted that only three agents be allowed onto the property.  Before letting them enter her house, she left them on the doorstep without warning or explanation, went into the house, locked the door, and then emerged approximately ten minutes later, claiming that she had needed to use the bathroom.  Several government agents testified that her behavior led to concerns about officer safety.

## No. 07-41041

veracity into question.[10]  The prosecutor was completely within his rights to challenge these insinuations by recalling for the jury evidence presented at trial: that Vasquez was "not one of those individuals that makes his living off providing information." Prosecutors are not forbidden from "present[ing] what amounts to be a bolstering argument if it is specifically done in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon . . . [the government's] witnesses." *United States v. Munoz*, 150 F.3d 401, 414-15 (5th Cir. 1998) (quotations omitted). In *United States v. Gracia*, this court specifically stated that prosecutors "may argue fair inferences from the evidence that the witness has no motive to lie." 522 F.3d 597, 601 (5th Cir. 2008). Nothing more was done here. The majority's attempt to find improper vouching is misplaced.

Equally misplaced are the majority's suggestions that the prosecutor related his personal opinion of Delgado's veracity and— incredibly—insinuated that he was imparting private information to the jury. The context of the statement shows that, while the prosecutor should have chosen his words more carefully, the majority's characterization of them is flawed. The prosecutor made the statement shortly after explaining to the jury how the evidence proved that Delgado, contrary to her protestations to the government agents, must have had the keys to the tractor-trailer cab. A reasonable jury would not have understood the prosecutor to be relating his personal opinion. As defense counsel correctly noted in objecting to the statement, Delgado's character for truthfulness was not at issue

---

[10] The majority's attempt to draw a distinction between what Delgado's counsel insinuated about Vasquez—namely, that he may have been behind the whole trafficking operation—and an argument that Vasquez had affirmatively lied, makes little sense. If Vasquez was, as defense counsel suggested, the "controlling" party, then everything he said on the stand was a lie.

53

No. 07-41041

because she had not testified. The prosecutor was not telling the jury that Delgado was a pathological liar. The thrust of the statement was that Delgado, and not the government witnesses whose veracity and motives her counsel called into question, was the one who made repeated attempts to shift the blame to others.[11]

One danger in prosecutorial statements vouching for a witness's credibility is that the jury will understand the prosecutor to be imparting information not presented at trial. For example, the statement "trust me, I know for a fact that this witness is telling the truth" conveys to the jury that the prosecutor knows the defendant committed the crime, but was not able to get everything he knows into evidence.[12] For the same reason, prosecutors cannot make comments during closing argument that operate as evidence—that is, where the jury must rely on the comments because the government failed to present evidence supporting them at trial. *See United States v. Allen*, 588 F.2d 1100, 1108 (5th Cir. 1979). "Nevertheless, the law remains that unflattering characterizations of a defendant will not provoke a reversal when such descriptions are supported by the evidence." *United States v. Windom*, 510 F.2d 989, 994 (5th Cir. 1975) (finding no error in a prosecutor's reference to a defendant as a "con artist"); *see also United States v.*

---

[11] For this same reason, the portion of the majority's argument based on Delgado's exercise of her Fifth Amendment right not to testify is mistaken. *See* Maj. Op. at 18-19. The relevance of this line of argument is unclear, and a cursory glance at *United States v. Beeks*, 224 F.3d 741, 746 (8th Cir. 2000), and *United States v. Schuler*, 813 F.2d 978, 981-82 (9th Cir. 1987), shows that they have nothing at all to do with this case.

[12] *See United States v. Leslie*, 759 F.2d 366, 378 (5th Cir. 1985) ("The test for improper vouching is whether the prosecutor's expression might reasonably have led the jury to believe that the prosecutor possessed intrinsic evidence, not presented to the jury, that convinced the prosecutor of the defendant's guilt."); *see also Gracia*, 522 F.3d at 601-02 (holding that the prosecutor erred in making four remarks "uniquely within the prosecutor's knowledge").

54

No. 07-41041

*Fields*, 483 F.3d 313, 360 (5th Cir. 2007) (holding that the defendant's substantial rights were not affected when the prosecutor referred to him as a "psychopath" during closing argument).

When read in context, the statement here is emphatically not the kind of "a wink and a nod" argument from which a jury would understand the prosecutor to be conveying personal knowledge of the defendant's guilt based on something other than the evidence presented at trial.[13]   The opinion's citation of the excoriating language in *United States v. Anchondo-Sandoval*, 910 F.2d 1234 (5th Cir. 1990),[14] is especially inappropriate.  In fact, *Anchondo-Sandoval* shows that the statement here was different in kind, not degree, from what the improper argument doctrine aims to prevent.  The prosecutor in that case related to the jury, among other improper statements, the following: "I am going to tell you my feelings in this case—the defendant in this case is one of the most artful liars I have ever met."  *Id.* at 1237.  In spite of this openly personal attack on the credibility of a testifying witness, the court *affirmed* the conviction.   The case presents, in contrast with what was said at Delgado's trial, a prime example of a "highly prejudicial injection of [a prosecutor's] personal opinion." Maj. Op. at 18.  The majority's equation of the prosecutor's remarks here to those made in *Anchondo-Sandoval* exemplifies its misreading of the facts.

---

[13] Nor does the majority have any fair basis for its assertion that the prosecutor "threw the weight of his own credibility as a representative of the United States behind his *personal* opinion." Maj. Op. at 17.  The overstatement is palpable.

[14] "The use of such tactics is inexcusable and causes this Court to view with a jaundiced eye convictions obtained where such obviously inappropriate methods have been employed." *Anchondo-Sandoval*, 910 F.2d at 1238.

No. 07-41041

This is not to say there was no problem with the statement. It may have confused the jury, and the prosecutor's clumsy language probably obscured the point he was attempting to make. The district court properly sustained defense counsel's objection. And that was that: the statement was a minor stumble that neither merited nor received much attention from the court or either counsel. No limiting instruction was given because none was requested. The majority's treatment of the statement as sufficient to undermine the entire trial or contribute to a cumulative error holding is a severe stretch.

Even assuming that the prosecutor's statement is what the majority makes it out to be, under this court's caselaw it does not come close to providing a sufficient basis for overturning the jury's verdict. The question is whether, "taken as a whole in the context of the entire case," the statement "prejudicially affect[ed the] substantial rights of the defendant." *United States v. Risi*, 603 F.2d 1193, 1196 (5th Cir. 1979) (quotation omitted). The court considers three factors in making this decision: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *United States v. Wyly*, 193 F.3d 289, 299 (5th Cir. 1999) (quotation omitted).

"If the evidence to support a conviction is strong, then it is unlikely that the defendant was prejudiced by improper arguments of the prosecutor and reversal is not required." *See, e.g.*, *United States v. Casel*, 995 F.2d 1299, 1308 (5th Cir. 1993), *vacated on other grounds as to one defendant sub nom. Reed v. United States*, 510 U.S. 1188 (1994). The test is stringent: it places a "substantial burden" on defendants. *United States v. Virgen-Moreno*, 265 F.3d 276, 290 (5th Cir. 2001). "A criminal conviction is not to be lightly overturned on the basis of

56

No. 07-41041

a prosecutor's comments standing alone.  The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Neal*, 27 F.3d 1035, 1051 (5th Cir. 1994) (quotation omitted).

No doubt, let alone serious doubt, exists here.  The statement was weakly prejudicial, if at all.  The majority's supposition that the jury could have relied on the statement alone to meet the statutory *mens rea* requirement is not credible, especially given the overwhelming evidence that Delgado knew exactly what was in the tractor-trailer cab.

The court must also examine the efficacy of any cautionary instruction given by the judge.  The majority relies heavily on the lack of a *sua sponte* cautionary instruction.  It is correct that the pre-closing-argument instruction informing the jury that "any statements, objections, or arguments made by the lawyers are not evidence" does not carry the same weight as a contemporaneous instruction.  But under our precedent, the lack of a cautionary instruction does not count against the government.  In *United States v. Sanchez*, the prosecutor made an improper statement implying that government employees are less likely to lie because of their official position.  961 F.2d 1169, 1176 (5th Cir. 1992).  As in this case, defense counsel objected, the court sustained the objection, defense counsel did not request a cautionary instruction, and none was given *sua sponte*.  Looking at the second factor of the improper argument test, the *Sanchez* court explained that while no cautionary instruction was given, "[i]t is . . . clear . . . that none was requested.  Thus, the second element of our test weighs neither in favor of nor

No. 07-41041

against [the defendant]." *Id.*[15] The same result must obtain here: having failed to request a cautionary instruction, Delgado cannot escape conviction simply because the majority deems such an instruction necessary in retrospect.

That leaves only the third factor. As demonstrated above, the evidence of Delgado's guilt is overwhelming.

Thus, even assuming that the statement was improper, *not one* of the three factors favors overturning the conviction.[16] Improper prosecutorial argument provides a weak peg on which to hang a finding of cumulative error.

### ii. Deliberate ignorance instruction

The majority's cumulative error holding also relies on the trial court's inclusion of a "deliberate ignorance" jury instruction. Delgado concedes that, because she did not object to the instruction at trial, the court should review for plain error—which the majority fails to do. *See United States v. Fuchs*, 467 F.3d 889, 901 (5th Cir. 2006). Under this court's precedent, any error that may have occurred did not prejudice Delgado's substantial rights.

A deliberate ignorance instruction is justified when the government presents evidence of the defendant's "subjective awareness of a high probability of the existence of illegal conduct" and "purposeful contrivance to avoid learning of the illegal conduct." *United States v. Threadgill*, 172 F.3d 357, 368 (5th Cir.

---

[15] *See also United States v. McDonald*, No. 93-03198, 1993 WL 481450, at *1 (5th Cir. Nov. 1, 1993) (per curiam) (unpublished) ("Assuming that the comment was inappropriate, it was not prejudicial, considering that no curative instruction was requested and that there was overwhelming evidence of [the defendant's] guilt.").

[16] This is especially obvious in light of *Anchondo-Sandoval*, in which this court affirmed the conviction despite the egregiously improper prosecutorial argument. The lone distinction in *Anchondo-Sandoval* is that the judge in that case gave a curative instruction—and under the holding of *Sanchez*, that distinction makes no difference when the defense fails to request one.

No. 07-41041

1999). Even assuming *arguendo* that the instruction was not appropriate, any error was harmless under well-established Fifth Circuit caselaw. In *Threadgill*, the court held that the error in giving such an instruction in the absence of evidence of contrivance is "'harmless where there is substantial evidence of actual knowledge.'" 172 F.3d at 369 (quoting *United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993)). The government put on substantial evidence of Delgado's actual knowledge. It cannot be that the instruction "ran the high risk of allowing the jury to erroneously convict Delgado." Maj. Op. at 35. The deliberate ignorance instruction comes nowhere close to reversible error. It provides yet another flimsy peg for the cumulative error holding.

### iii.   *Sears* instruction

The majority also concludes that the district court erred by failing to *sua sponte* give a *Sears* instruction on the conspiracy charge. This is wholly irrelevant as the majority has determined that sufficient evidence did not support Delgado's conspiracy conviction. In addition, the majority fails to acknowledge that Delgado neither requested, nor objected to the absence of, a *Sears* instruction. This court has stated that unobjected-to omissions of jury instructions "may be raised on appeal as plain error . . . only in egregious instances." *United States v. Arky*, 938 F.2d 579, 582 (5th Cir. 1991) (quotation omitted). "To meet this standard, [the defendant] must show that the omission of the instruction was more than reversible error; he must show that it resulted in a grave miscarriage of justice." *Id.* (quotation omitted).

It would have been better for the district court to provide a *Sears* instruction here, where the unindicted co-conspirators were described but not named, and where a substantial amount of the testimony against Delgado came from a

No. 07-41041

government informant. But if the failure to *sua sponte* give the instruction did constitute error, the error was far from egregious and did not affect Delgado's substantial rights. She never advanced the defense that she only conspired, if at all, with a government agent; her defense was based solely on the knowledge requirement. And the government did not assert that Delgado could be held liable for conspiring with Vasquez.[17] When discussing the elements of the conspiracy charge in his closing argument, the prosecutor told the jury that the trafficking conspiracy involved three people: the supplier of the drugs, Delgado, and the person to whom Delgado was to deliver the cargo. "[T]hat right there," he argued, "shows you that she entered into an agreement with some other individuals to get this marijuana up north." The lack of a *Sears* instruction did not impede Delgado's defense.[18]

In *United States v. Slaughter*, this court rejected a similar argument that a trial court erred by failing to deliver a *Sears* instruction. 238 F.3d 580 (5th Cir. 2000). The court found *Sears* "distinguishable because the Government indicted

---

[17] The government did argue, quite accurately, that Delgado's conduct in arranging for the transportation of the marijuana was part of the conspiracy to move the drugs out of Texas, where their resale value would increase. It never asserted, though, that Vasquez was a conspirator.

[18] Additionally, the jury was accurately instructed on the law of conspiracy. Even if the addition of a *Sears* instruction would have been optimal, it is unlikely that the jury, which we presume follows the court's instructions, *Zafiro v. United States*, 506 U.S. 534, 540 (1993), would have considered Vasquez a co-conspirator. The court instructed the jury that a conspiracy "is an agreement between two or more persons to join together to accomplish some unlawful purpose" and that it must find that "two or more persons, directly or indirectly, reached an agreement to possess with intent to distribute a controlled substance." The written jury charge included the additional instruction that a conspiracy "is a kind of 'partnership in crime' in which each member becomes the agent of every other member." It was abundantly clear from the evidence that Vasquez never had the requisite intent and that he was not Delgado's "partner in crime."

and presented evidence at trial to establish a conspiracy existed which included Slaughter and five others who were not government agents or informants." *Id.* at 585. Additionally, as here, the defendant "[did] not argue that the evidence was insufficient to establish the existence of the conspiracy charged in . . . the indictment." *Id.* The Ninth Circuit has twice rejected similar arguments for a *Sears* instruction: "Where a defendant does not offer a particular instruction, and does not rely on the theory of defense embodied in that instruction at trial, the district court's failure to offer an instruction on that theory *sua sponte* is not plain error." *United States v. Montgomery*, 150 F.3d 983, 996 (9th Cir. 1998); *see also United States v. Romero*, 282 F.3d 683, 689 (9th Cir. 2002) (same). The district court's failure to provide the unrequested *Sears* instruction did not amount to plain error, much less result in the "grave miscarriage of justice" that our jurisprudence requires. *Arky*, 938 F.2d at 582.

### iv.  Other grounds to support the cumulative error holding

As further support for its cumulative error holding, the majority mentions two additional purported problems. While it does not go so far as to call either an error, it significantly overstates their impact on the fairness of the trial. Both issues can be dealt with summarily.

Although the trial transcript does show a number of minor omissions, none was prejudicial to Delgado. Nothing in her appeal relates to the voir dire, and a review of the transcript shows that those proceedings are discernible and that there was no error in the district court's handling of jury selection. All of Delgado's objections and all of the court's rulings are on the record. The scattered

No. 07-41041

gaps in the record do not cast any doubt on the verdict.[19]  The omissions did not prejudice Delgado and do not bolster an otherwise unjustifiable finding of cumulative error.

The district court's denial of a mistrial after the prejudicial and purportedly non-responsive testimony from Agent Spivey[20] was obviously not an abuse of discretion; the district court's handling of the statement, late in the trial, was exemplary.[21]  Even assuming that the remark was not invited and was prejudicial, there is no significant possibility that it had a substantial impact on the jury's verdict.  *See United States v. Limones*, 8 F.3d 1004, 1007-08 (5th Cir. 1993).  The court delivered an effective cautionary instruction, and the evidence that TJ Trucking was *presently* involved in drug trafficking was overwhelming.  The jury

---

[19] Absent specific prejudice, we have found reversible error only where transcript omissions are "substantial and significant"—for example, when the record contained no transcript of the closing arguments; when it omitted voir dire proceedings, opening, and closing statements; and when there was no transcript at all.  *See United States v. Selva*, 559 F.2d 1303, 1304 (5th Cir. 1977); *United States v. Gregory*, 472 F.2d 484, 486 (5th Cir. 1973); *United States v. Rosa*, 434 F.2d 964, 965 (5th Cir. 1970).  We have not found reversible error when a transcript was missing seventy-two bench conferences.  *See United States v. Gieger*, 190 F.3d 661, 667 (5th Cir. 1999); *see also United States v. Aubin*, 87 F.3d 141, 149-50 (5th Cir. 1996) (holding that failure to transcribe nine bench conferences did not constitute reversible error).  Here, unlike in *Gieger* and *Aubin*, the transcript contains insubstantial omissions, not large, substantial gaps.

[20] "Q: Did you all investigate I believe it was TJ trucking?  A: We had prior knowledge of TJ Trucking being involved in narcotics trafficking, yes."  The answer was not obviously uninvited.  There is no indication that Agent Spivey was trying to "work in" this information; he simply gave a broader response than was specifically asked for, as witnesses often do.

[21] The district court heard argument from counsel at a bench conference, decided that the answer was prejudicial but not wholly uninvited, and reasoned that a limiting instruction would cure any prejudice.  The limiting instruction was thorough and delivered immediately following the bench conference.

No. 07-41041

would have had no reason to rely on Agent Spivey's off-the-cuff remark in deciding to convict. Neither purported problem supports the court's holding.

### v.   Cumulative error holding

Cumulative error justifies reversal only when errors "so fatally infect the trial that they violated the trial's fundamental fairness." *Fields*, 483 F.3d at 362 (quotation omitted).

> A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the government's case.

*United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993). To support its holding, the majority relies primarily on the three purported errors discussed above. At best, it has identified two unobjected-to instances in which the jury instructions could have been improved, neither of which comes close to reversible error and one of which is irrelevant to the remaining charge. None of the three purported errors was more than weakly prejudicial, if at all. There are no serious errors to cumulate, and so the doctrine has no place. It is not meant to bootstrap a series of close calls or non-prejudicial errors into reversible constitutional error.[22]

---

[22] This court has also stated, in an unpublished opinion, that a defendant's failure to sufficiently brief the manner in which cumulative error affected his case weighs against such a holding. *United States v. Romero*, 339 F. App'x 470, 479 (5th Cir. 2009); *see also United States v. Kimbrough*, 69 F.3d 723, 735 (5th Cir. 1995) ("Kimbrough's current argument . . . completely fails to specify how the cumulative effects of these events prejudiced him."). Delgado's brief fails to do more than mention the doctrine as a catch-all remedy. It does not explain how the purported errors cumulated to affect Delgado's substantial rights.

No. 07-41041

Even assuming that errors occurred and that they were prejudicial, they do not clear the high bar this court has imposed on the use of a remedy of last resort. We have repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances.[23] Its application is especially uncommon when the government presents substantial evidence of guilt.[24]   The doctrine justifies reversal only in the unusual case in which synergistic or repetitive error violates the defendant's constitutional right to a fair trial.  That did not happen here.  The purported errors were not interrelated, and the majority has not come up with a convincing argument that they were in any way synergistic or self-multiplying. Perhaps most tellingly, the majority has not cited a single instance in which this court—or any other—has reversed for cumulative error on such scattered and insubstantial putative errors.

This court has been careful to limit reversals for cumulative error because the doctrine is necessarily amorphous and context-specific.  It serves as a judicial safety valve for trials so infected by unobjected-to or harmless error that the reviewing court lacks faith in the jury's verdict.  It was never intended to correct mere imperfection.  The Federal Reporter is replete with cases in which we have declined to reverse for cumulative error, although some error did occur.[25]  The

---

[23] *See United States v. Villarreal*, 324 F.3d 319, 328 (5th Cir. 2003) ("We have stressed, however, that a reversal based on the cumulative effect of several alleged errors is a rarity."); *United States v. Reedy*, 304 F.3d 358, 373 (5th Cir. 2002) (same); *United States v. Wicker*, 933 F.2d 284, 292 (5th Cir. 1991) (same); *United States v. Lindell*, 881 F.2d 1313, 1327 (5th Cir. 1989) (same); *United States v. Iredia*, 866 F.2d 114, 118 (5th Cir. 1989) (same).

[24] *See United States v. Neal*, 27 F.3d 1035, 1051-52 (5th Cir. 1994) ("[W]e are not persuaded, in light of the substantial evidence of guilt adduced at trial, that the Defendants are entitled to reversal on the basis of cumulative error.").

[25] *See, e.g.*, *United States v. Valencia*, --- F.3d ----, Nos. 08-20546, 08-20573, 2010 WL 809813, at *31 (5th Cir. 2010) (rejecting cumulative error argument although the government

No. 07-41041

cases in which we have reversed for cumulative error present strikingly different circumstances—the errors were either overwhelming or genuinely synergistic.[26] This case is not just near the line.  It is far from it, and the reversal here will be taken as a significant expansion of the doctrine.

---

erred in presenting evidence during its opening statement and in failing to timely notify defense counsel of its fee arrangement with an expert witness); *United States v. Fields*, 483 F.3d 313 (5th Cir. 2007) (rejecting cumulative error argument although the district court incorrectly advised the jury venire about the grand jury's findings and erroneously failed to assign reasons for physically restraining the defendant, and although the prosecution referred to the defendant as a "psychopath" in its closing statement); *United States v. Ricardo*, 472 F.3d 277, 287 (5th Cir. 2006) (holding that "[w]hile there were errors in this case"—including at least one evidentiary error—they did "not provide a sufficient basis to warrant reversal."); *United States v. Wicker*, 933 F.2d 284, 292 (5th Cir. 1991) (rejecting cumulative error argument although the prosecutor made several improper comments); *United States v. Cochran*, 697 F.2d 600, 607-08 (5th Cir. 1983) (rejecting cumulative error argument because two complained-of incidents, including an improper prosecutorial argument, did not occur on the same day and did not have an improper cumulative effect on the jury's verdict);  *United States v. Stapleton*, 65 F. App'x 508, 2009 WL 1922956, at *6 (5th Cir. Mar. 28, 2003) (unpublished) ("[E]ven assuming that error is manifest in [the defendant's] references to prosecutorial misconduct and the district court's admission  of extraneous offense evidence, these few instances of misconduct, taken together, simply do not yield a denial of the constitutional right to a fair trial.").

[26] *See United States v. Riddle*, 103 F.3d 423, 435 (5th Cir. 1997) (reversing for cumulative error in light of improper expert testimony by a government witness, erroneous exclusion of defense expert testimony, erroneous admission of certain reports, improper admission of extraneous evidence, and improper admission of a memorandum associating defendant with numerous criminals and criminals scenarios); *United States v. Labarbera*, 581 F.2d 107, 110 (5th Cir. 1978) (reversing for cumulative error in light of two improper cross-examination questions and an improper prosecutorial statement in which the prosecutor indicated that he knew of incriminating evidence not before the jury); *United States v. Diharce-Estrada*, 526 F.2d 637, 642 (5th Cir. 1976) (reversing for cumulative error in light of the trial court's decision to start the trial in the evening after the jury members had waited a full day to begin, its improper opening remarks, which put undue pressure on the jury to reach a quick verdict, its disparaging remarks to defense counsel, its denial of defense counsel's motion for acquittal in the presence of the jury, and the prosecutor's improper closing argument).

No. 07-41041

## CONCLUSION

The panel majority disregards the substantial evidence supporting Delgado's conviction and substitutes its own judgment for that of the jury. Although Delgado never raised the buyer-seller exception or challenged the sufficiency of the evidence at trial or on appeal, the panel majority raises the issue *sua sponte*. In order to justify the result, the majority panel opinion significantly rewrites and expands this circuit's buyer-seller exception.

Discussing the cumulative error doctrine in the habeas context, this court recognized that it "is an infinitely expandable concept that, allowed to run amok, could easily swallow the jurisprudence construing the specific guarantees of the Bill of Rights and determining minimum standards of procedural due process." *Derden v. McNeel*, 978 F.2d 1453, 1457 (5th Cir. 1992) (en banc). The majority's decision is a manifestation of precisely that danger. Its holding that prejudicial errors occurred distorts this court's prosecutorial misconduct and conspiracy doctrines. The majority also misapplies this court's cumulative error jurisprudence by expanding the doctrine to cover unrelated weak or non-existent errors. It is the rare trial that proceeds without a single miscue; "[a] defendant is entitled to a fair trial, not a perfect one." *United States v. Ragsdale*, 438 F.2d 21, 28 (5th Cir. 1971). Delgado's trial was far from unconstitutionally unfair. The majority's holding to the contrary will be read to cast doubt on the outcomes of similarly routine trials. I would affirm the jury's verdict and must respectfully dissent.[27]

---

[27] Like the majority, I take no position on Delgado's argument that her sentencing was flawed by the erroneous application of a two-level enhancement for a "leadership role."

66